## A TEAMSTER'S RIGHTS AT A STREET CROSSING.

Court of Appeals for Richland County.

THE MANSFIELD RAILWAY, LIGHT & POWER COMPANY v. SARAH
A. KINER, ADMINISTRATRIX.

Decided, January Term, 1913.

*Heavily Loaded Wagon Struck by Car at Street Crossing—Death of Driver Follows Later—Disputed Cause of Death—Growing Disrepute of Expert Medical Testimony.*

1. The driver of a vehicle arriving at a street crossing in advance of a car has the prior right to cross, and in doing so he may assume that the approaching car is being operated in a careful and prudent manner and is under proper control, and that its speed does not exceed that fixed by municipal ordinance; and it is his right to proceed notwithstanding his so doing may require that the speed of the car be reduced, or even that the car be brought to a full stop to avoid a collision.

2. It is not always incumbent upon one about to cross a street car track, either on foot or with a team, that he should look and listen for an approaching car, but it is sufficient if reasonable care is exercised, and whether or not reasonable care was exercised in a given case is a question of fact for the jury dependent upon the surrounding circumstances.

3. A jury may properly accept the testimony of the decedent's own physician as to the case of his death, as against the testimony of the physician of the company whose car struck him and that of an expert medical witness.

MARRIOTT, J.; VOORHEES, J., and SHIELDS, J., concur.

This action is in this court upon error from the Court of Common Pleas of Richland County. The suit below was by the administratrix of Philip Kiner, deceased, and against the Mansfield Railway, Light & Power Company, to recover damages for the alleged wrongful death of the decedent, husband of Mrs. Kiner, caused by the alleged negligence of plaintiff in error, in running and operating its cars on South Main street in the city of Mansfield, where at the intersection of Third street with South Main street, on June 24, 1909, one of plaintiff in error's cars collided

with a heavily loaded wagon on which the decedent was then riding, and from which he was thrown to the street receiving injuries from which it is claimed he died on September 19, 1910. The action below was prosecuted by the administratrix of the decedent for the benefit of herself, as widow, and a minor child of decedent, resulting in a verdict for $4,500, upon which judgment was rendered, which is now sought to be reversed by this proceeding in error.

The amended petition upon which the case was tried charged in substance as follows: the plaintiff says that she is the duly appointed and acting administratrix of the estate of Philip Kiner, who died on the 19th day of September, 1910, as hereinafter alleged; that defendant is now and was at the time of committing the grievances hereinafter complained of, a corporation organized under the laws of Ohio, and at the time set forth herein was operating a street railway in the city of Mansfield, Richland county, Ohio, with its cars and other necessary and proper equipment, tracks, wires, etc., and that said cars were run by electricity; that said defendant, at the time herein set forth, had a track on South Main street in said city of Mansfield, and operated its cars upon the said track; that said South Main street is crossed at right angles by First street of said city, and that both of said streets are public streets of said city, and much used and traveled by vehicles and pedestrians having occasion to use the same, and in running its cars over said South Main street and across First street the defendant was required to operate its cars with due care so as not to come in contact with persons or vehicles crossing its tracks at the point described. That defendant was forbidden by the ordinance of the city of Mansfield, in force at the time in question, to run its cars upon its tracks within the city over the crossing of said described streets at a rate to exceed eight miles an hour.

Plaintiff says that on the 24th day of June, 1909, the decedent, Philip Kiner, was driving a team of horses hitched to a wagon loaded with gravel along said First Street of said city going west, toward South Main street and the intersection of said First and South Main streets, and where so driving said

team of horses, and while crossing said South Main street, driving said team, and while seated upon said wagon, the said decedent's team and wagon was struck by one of defendant's cars running north upon its track on said South Main street, and thereby the decedent, Philip Kiner, was injured as herein set forth. She says that at the time decedent received his injuries and as he approached said South Main street to cross the same, and while exercising due care on his part, and without any negligence on his part, one of the defendant's cars in charge of a motorman and conductor of defendant approached from the south, and while running at a reckless and dangerous speed, to-wit, at about twenty-five to thirty-five miles struck decedent's wagon and team; that when decedent started to cross the track of defendant he had ample time to cross in safety if the car striking decedent had been running at a speed not to exceed eight miles an hour, or at any reasonable speed, and decedent had a right to believe and did believe that said approaching car, which was a block and a half away from said crossing when decedent started across the track, was not running at a speed to violate the city ordinance nor at a speed that he could not cross in safety; that said car, in charge of the agents and servants of defendant, was run by said servants and agents of defendants at a speed in violation of the ordinance of the city, negligently, recklessly and wilfully against the wagon and team of decedent and injured decedent as hereinafter alleged; that when decedent started to cross the track of defendant the motorman could see decedent starting across or upon the track with his team, two or three blocks away, and said motorman knew that at the speed he was running the car it would strike the team and wagon before it could get across; but she avers that decedent did not know the speed of the car and could not learn its speed from his position, and she avers that decedent reached the track when the car was at least a block and a half away. and had a right to cross, and that the agents and servants of defendant had ample time after seeing, as they did, decedent crossing the track, to have checked the speed of the car or stopped it, and thereby have prevented the collision. But plaintiff avers

that the agents and servants in charge of the car negligently, recklessly and wilfully approached said crossing in a great speed and ran against the wagon and team of decedent with a great force and violence, and thereby hurled him from the wagon into the street, thereby receiving injuries from which he died on September 19, 1910. She says that by the contact of the car with the team and wagon of the decedent, the decedent was thrown into the street and under the horses' feet; that two of his fingers of his left hand were broken or dislocated, his arm bruised and injured, his right eye was cut and his head injured, and his back and head were injured. She avers that by reason of said injuries decedent was rendered unconscious for several hours, and from which injuries he died on the 17th day of September, 1910. And she avers that Philip Kiner left surviving him the plaintiff, who is his widow, and as sole next of kin Rebecca Kiner, his daughter, aged 16 years, and she prays for judgment in the sum of ten thousand dollars.

To this petition the defendant below answers and says: it admits that it is and was operating a street railway in the city of Mansfield, Richland county, Ohio, with its cars and other necessary and appropriate equipment. It admits that on the 24th day of June, 1909, Philip Kiner was driving a team of horses attached to a wagon, loaded with gravel along East First street of said city, at a point where said First street of said city crosses South Main street. It admits that East First street and South Main street are public streets of said city. It admits that the ordinance fixing the rate of speed of street railway cars in the city of Mansfield is at the rate of speed not to exceed eight miles an hour. And then defendant denies each and every other allegation in the petition contained not herein expressly admitted. For a second defense the defendant avers that the injuries received by said Philip Kiner were caused by his own fault and negligence in failing to look and listen, or take any precaution whatever to ascertain the approach of a car. Wherefore its prays to go hence without day and for its costs.

To this answer the plaintiff below filed a reply, denying each and every averment of the answer charging contributory negligence to Philip Kiner, deceased.

Upon the issues thus made by the pleadings, the cause was tried to a jury at the January term of court, 1912, resulting in a verdict of the jury in favor of the plaintiff below for $4,500

A motion for a new trial was made, heard and overruled, and judgment was rendered by the court upon the verdict. A bill of exceptions was allowed, signed and sealed by the trial court, and the cause is now before this court upon the petition in error, and the original papers in the case, together with the entire record.

The grounds of error upon which the plaintiff in error relies for a reversal are:

First. The verdict and judgment are contrary to the law.

Second. The verdict and judgment are against the weight of the evidence.

Third. That the court erred in the admission of evidence objected to by plaintiff in error.

Fourth. That the court erred in ruling out evidence offered by the defendant in error.

Fifth. That the court erred in its charge to the jury.

Sixth. That the court erred in refusing to charge the jury as requested by the plaintiff in error.

Seventh. That the damages given by the jury are excessive.

Eighth. The court erred in refusing to sustain the motion made at the close of defendant in error's evidence and renewed at the close of all the evidence, to direct a verdict in favor of the plaintiff in error.

There is much conflict in the evidence, as shown in the record, as to the rate of speed at which the car was running at the time and before the collision with decedent's wagon.

There is some conflict in the evidence as to the cause of Kiner's death, whether it resulted from the injuries received at the time of the accident, or whether it resulted from causes in no way connected with the injury received at the time of the collision. Of this conflict in the testimony we will speak hereafter.

There is no dispute but that Kiner, the plaintiff's decedent, prior to the accident, was an able-bodied man; that he was not known to be suffering with any disease which would impair his

health or lessen his ability to perform labor and earn wages, save that some five or seven years prior to the 24th day of June, 1909, when he received the injury complained of, he had received an injury while working for the Eclipse Stove Company of Mansfield, which resulted in the loss of his right arm near the elbow; that he had worked for the Eclipse Stove Company for some ten or twelve years prior to receiving the injury; that after losing his arm he took up the occupation of teaming and continued to do teaming until he received the injuries complained of in the petition. That he was capable of earning and did earn, with his team, regularly, when working, four to five dollars per day.

It is not disputed but that the injuries complained of, and as a result of which it is complained he died, occurred at the intersection of First street with South Main street in the city of Mansfield, on the 24th day of June, 1909.

It is not disputed but that there is a decline in South Main street from the top of a hill south of the point where First street crosses Main street for a distance of sixteen to eighteen hundred feet; that the grade from the top of the hill south of First street is from three and a half to seven per cent., that for five hundred feet immediately south of the point where First street crosses Main street the grade is seven per cent.; that from the point where the accident occurred north, the street extends to Second street at a grade of about five per cent. This elevation and grade are shown upon the map and profiles of the street offered in evidence as an exhibit, and are conceded to be correct.

The evidence of Mr. Merkel, the city engineer, which is not controverted, establishes the fact that First street and Main street, at the point of intersection, where the accident occurred, are each sixty feet wide. Main street from the top of the hill south runs straight north into the city. There is nothing to obstruct the view from a distance of eighteen hundred feet south of First street. The motorman in charge of the car at the time of the accident concedes that he had full view of the entire distance of the street.

According to the undisputed evidence, South Main street on both sides for a considerable distance both ways from the crossing of First street, was built up with many residences, offices, and some business buildings. There are several streets and alleys crossing Main street south of First street.

The accident occurred at a most frequented part of the city of Mansfield, upon one of the principal streets of the city, upon which people were accustomed to travel at all times of the day. The accident occurred about 8:30 o'clock of the forenoon of June 24th.

That the car was approaching the crossing at a high rate of speed there is little doubt. Witnesses called by the plaintiff fix the rate at twenty-five to thirty-five miles an hour. The motorman in charge of the car could have seen decedent as he drove out of First street upon Main street, had he been keeping a look-out, for several hundred feet away. He could see, and if he looked he saw Kiner driving straight across the track in the center of the street in front of him.

George Mortimer, an eye-witness of the accident, testifies that he was driving on Main street, about three hundred feet south of First street; that the car passed him going thirty-five to forty miles an hour; that he saw no decrease of speed until the car struck the wagon; that the motorman did not have the brakes on when the car passed him, nor was he using the brake. He heard no alarm given; he says he saw the wagon driven by Kiner, when the car was at Glessner street (which is more than 1000 feet south of First street, according to the map) ; that the horses were about to cross the street. According to this witness the car must have been traveling at a high and dangerous rate of speed to have traveled 1000 feet before Kiner's wagon was clear of the track.

Glenn Shaw, an eye-witness of the accident, says he was standing on Main street near the point of the accident; saw the car coming down the hill a block and a half or two blocks south of First street; that the car was coming at a rate of twenty to twenty-five miles an hour; that he saw Kiner; that the horses' feet were just on the track; that the motorman did not ring the

bell nor set the brakes until after the car struck the wagon, but that he set the brake after the car struck the wagon.

Lester Simms, a witness for the plaintiff, was standing on First street east of Main, was looking west on First street, and saw the car strike the wagon; that the car was "coming pretty fast."

Numerous witnesses testified to having heard the "crash" when the car struck the wagon; some were in their houses with the doors closed when they were attracted by the "awful crash."

John Barr, witness for plaintiff, had experience in running and operating cars on the streets of Mansfield, and especially on South Main street; he had been a motorman for the defendant company. He testifies that a car would run down the hill on South Main street at a rate of twenty-five to thirty miles an hour, unless the brakes were applied; if the car was under control, running at a rate not to exceed eight to ten miles an hour, it could be stopped "easily" in three car lengths; that a car is thirty to thirty-five feet in length.

The defendant called numerous witnesses to the accident who gave testimony directly and materially in conflict with the evidence offered by plaintiff as to the speed the car was running.

Harry Stiles was the motorman in charge of the car at the time of the accident. He had been employed as a motorman only three or four months. He saw Kiner when he was about two hundred feet away, near Augustine avenue. While this witness put the distance as about two hundred feet, Augustine avenue, according to the measurements as shown upon the map, is more than three hundred feet south of First street. He says he was coming down the hill at about eight miles an hour; that when he struck the wagon the car was not running more than four miles an hour.

Witness B. F. Finley was the only passenger on the car. He testifies that when he noticed the motorman trying to stop the car he "looked up and saw the wagon going across the track in front of the car." When he saw the motorman trying to stop the car he thinks "the car was about at Corporation alley, south of First street, when the motorman made the effort to

stop the car," at the time the horses' front feet were on the railway track. According to the undisputed evidence Corporation alley is two hundred feet south of First street.

At this time, according to the testimony of the motorman, the car was and had been under complete control, the brakes were on all the way down the hill, a distance of more than 1,600 feet, yet when he applied the brake in an effort to stop the car 200 feet from the wagon the wheels of the car slid or slipped on the rails.

It would seem unreasonable to suppose that if the car was running at a rate of speed not greater than eight miles, and the car was under complete control, that the tightening of the brakes would cause the wheels to slip upon the rails; but it would be quite reasonable to suppose and to believe that if the car was being run down the hill at a high rate of speed, say twenty-five to thirty-five miles an hour, and the brakes were suddenly applied with force enough to lock the wheels, the momentum of the car would carry it forward and cause the wheels to slide upon the rails.

We think it quite consistent with reason and experience that if the car at the time the brakes were applied was not running at a much greater rate of speed than eight or nine miles, it could and would have been brought to a dead stop within much less distance than two hundred feet, or even one hundred feet; and we are forced to the conclusion, as the jury must also have been, that the motorman did not have his car under control, but that it was being run at a reckless and dangerous rate of speed at the time the brakes were applied, if applied at all. We do not think the story of either the motorman or the conductor as to the speed the car was running, at the time of its collision with the wagon, is consistent with truth or reason.

The wagon on which decedent was riding when struck by the car was a new and very heavy wagon. It was very heavily loaded with gravel, weighing, according to the evidence, six or more thousand pounds. The horses drawing the wagon were very large and heavy horses. They had crossed over the track and the car struck the heavily loaded wagon near the center or

back of the front wheels with such force as to shove or throw it entirely off the track, practically demolishing the wagon, throwing the horses to the pavement, hurling the driver to the street, and seriously crushing and breaking the front end of the car.

All these facts, of which there is no dispute, would seem to establish beyond a reasonable doubt that the defendant company was guilty of gross carelessness and culpable negligence in the running of its car at the time and place and under the circumstances as shown by the evidence.

There seems to be no substantial question but that the plaintiff's evidence, if believed, showed a clear case of actionable negligence, warranting the jury in returning the verdict it did, unless we are to assume that the company had a right to operate its car at a dangerous rate of speed, without warning of approach at street crossings, and thus throw all the burden of care on the traveler seeking to cross a street on which its track is laid and operated. This we are not ready to concede.

Each party had an equal right to the use of the street at the crossing. The decedent had a perfect right to go over the crossing ahead of the car, notwithstanding the fact that his doing so would require the speed of the car approaching to be retarded or even brought to a stop, if necesary, to prevent a collision. The one first at the crossing had the right to precede the other in going over the crossing.

Plaintiff's decedent in approaching the crossing with the purpose of driving over the same had the right to assume, in the absence of knowledge to the contrary, that the motorman in charge of the company's car was regulating the speed of the car within the limits provided by the ordinance, and that he was operating his car in an ordinarily careful and prudent manner; that is, that his car was under control so that the same could be stopped within a reasonable distance.

In the light of such presumption decedent would have the right to cross the track such a distance from the car as an ordinarily prudent person would undertake under the same or similar circumstances; and it would not be negligence for the driver of a vehicle to cross the street car track ahead of an ap-

proaching car when the car was so far away that by the exercise of ordinary care it might be stopped before reaching the place of crossing. He would have the right to assume that cars operated on a public street, in a much frequented part of the city, would not be operated or run at a street crossing at a dangerous rate of speed, without at least giving timely warning of their approach:

Many authorities are cited by able counsel both for plaintiff and defendant on the relative rights of street cars and vehicles at crossings, and we acknowledge indebtedness to counsel for the assistance they have rendered the court; but we think the cases of *Toledo Street Railway Co.* v. *Westenhuber*, 22 O. C. C., 67, affirmed without report 65 O. S., 567, and *Steubenville & Wheeling Traction Co.* v. *Brandon*, 87 O. S., 187, lay down the law applicable to and controlling in the case at bar, and we do not deem it important to discuss or review the many other cases cited.

Counsel for plaintiff in error insist that the trial court erred in refusing to give to the jury the special charge requested, and in the language of the request, to-wit:

"In crossing a street car track at the intersection of a street the driver of a loaded wagon is not required to look the whole length of the visible track to see if a car is coming, but the plaintiff would be required to look along the track far enough to warrant an ordinarily prudent man, having in mind his own safety, under like circumstances, to conclude that no car was in such proximity as to endanger his safety in crossing. And if by looking Philip Kiner could have seen the approaching car in such proximity and time to have avoided the accident, your verdict should be for the defendant."

We think the court in its general charge substantially charged the law as requested, and that it was not error not to repeat it in a special charge, and that the refusal to give the request was not prejudicial to the plaintiff in error.

The request was clearly taken from the 8th syllabus of the case of *Marden* v. *Portsmouth, K. & Y. Street Railway*, 60 Atl., 530, which reads:

"8.   In crossing a car track at the junction of a street, the
traveler is not required to look the whole length of the visible
track to see if a car is coming, but along the track far enough
to warrant an ordinarily prudent man, having in mind his own
safety, under like circumstances, to conclude that no car was
in such proximity as to endanger his safety in crossing."

This charge, as well as the charge requested, would be mis-
leading in that it implies that under all and every circumstance
"the driver of a loaded wagon," in crossing a street car track,
while not bound to look the whole length of the visible track, yet
nevertheless would be bound before crossing to look along the
track, and this without regard to the particular circumstances
of the case; that a failure to look along the track before cross-
ing would defeat a recovery.

We do not think this is the law in Ohio.   We do not think
it is incumbent upon one about to cross a street car track, whether
upon foot or with a team, as a matter of law, to look and listen.
It is sufficient if he exercises reasonable car, and whether he
exercises reasonable care is a question of fact for the jury, de-
pending upon the circumstances of each particular case.   5th
and 6th Syl., *Marden* v. *Portsmouth Ry. Co., supra.*

In *Cincinnati Railway Co.* v. *Snell*, 54 O. S., 197, the court
lays down the following rule:

"A person about to cross the track of a street railway at a
street crossing is bound to exercise care proportionate to the
danger to be avoided and the consequences which might result
from want of it, conforming in amount and degree to the par-
ticular circumstances surrounding him; but it is only ordinary
care which is required, that which might reasonably be expected
of persons of ordinary prudence.   Ordinary care does not re-
quire him to anticipate negligence on the part of those operating
the railway; and while he should use his faculties for his own
protection, it is not negligence *per se* for him to omit to look in
both directions for the approach of a car.   Whether it is or not
negligence depends upon the particular circumstances."

Massachusetts cases are cited in the opinion of the court to
the following effect:

That the fact that plaintiff's evidence does not show that he
looked up and down the street before crossing is not as matter

of law conclusive evidence that he was not in the exercise of due care, and that the mere fact of not looking when one attempts to cross a railroad is not conclusive evidence of want of care. Citing *Williams* v. *Grealey,* 112 Mass., 82; *Bowser* v. *Huntington,* 126 Mass., 391; *Shapleigh* v. *Wyman,* 104 Mass., 118.

Our own Supreme Court, in the case of *Steubenville & Wheeling Traction Co.* v. *Brandon, supra,* lays down the following rule:

"Omission by one about to drive a horse and wagon across a street railway track constructed and operated upon a public street * * * to look for the approach of a car, is not in all cases and as matter of law negligence which will defeat a recovery for injuries received by such driver in a collision between the wagon and a car of the railway company, his duty being to exercise ordinary vigilance to avoid a collision, and whether he has exercised such vigilance or not depends upon the circumstances of each particular case."

We think there was no prejudicial error in the refusal of the court to give the charge requested.

Plaintiff in error contended at the trial below that decedent's death did not result from the injuries received at the time of the accident, and to rebut the plaintiff's evidence offered in support of her claim that decedent's death was produced by the injuries received, or resulted therefrom, called two physicians, Drs. Findley and Harding, who testified that they saw Kiner (decedent) at the hospital immediately after he had been injured, and in company with Drs. Miller and Mecklem examined him with a view to ascertaining the nature of his injuries. They were occupied in their examination about thirty minutes and never saw the deceased afterwards, at least Dr. Harding did not. Dr. Findley was the regular physician and surgeon of the railway company, and Dr. Harding was paid by the railway company and made his report to the company's surgeon, Dr. Findley. They both testified as medical experts, neither of them being the family physician of Kiner, or having any personal knowledge of the actual cause of death; but in answer to various hypothetical questions gave it as their opinion that death was

not the result of the injuries received on the 24th day of June, 1909.

Dr. W. S. Mecklem was the family physician of decedent. He took charge of Kiner the night of the accident, and he saw him every day for about two weeks after the injury, and then he saw him off and on at his office until Kiner was unable to be out of his house. He had been the family physician for two or three years before the injury. He testifies that Kiner was in good health up until the time of the accident. He testifies that from the time of the injury until the death that decedent complained of pains in his breast and in his heart. He says he died of heart trouble—called by the expert physicians endocarditis, that is, inflammation of the lining of the membranes of the heart and valves.

This family physician, who treated Kiner from time of his injuries until he died, saw him the day preceding his death in the morning and testifies that his death was caused by the injuries received at the time of the accident.

During all of the time intervening between the accident and the death of Kiner, he had great trouble in breathing, and toward the last of his sickness he was unable to lie down but sat propped up in a chair.

As against the testimony of Mecklem, Drs. Harding and Findley give it as their expert opinion that death did not result from the injuries received at the time of the accident.

The jury are the sole judges of the weight to be given the testimony. These physicians appeared and testified before the jury. They had the opportunity to observe the medical witnesses in giving their testimony, and their bias in the case, if any was manifested. Dr. Findley, as above stated, was the regular retained physician and surgeon of plaintiff in error. Dr. Harding was a professional witness, and was usually called in such cases as a medical expert, according to his own testimony. The jury had the right to believe the testimony of the family physician as against both the other witnesses; and after carefully reading the testimony of these several witnesses it is manifest to the court, as it must have been to the jury, that the testimony

of Dr. Mecklem, the family physician, sustained and reinforced by the testimony of the witness, had the greater weight.

The value of expert testimony, especially the testimony of medical experts, in many jurisdictions is not regarded as the highest class of testimony. Dr. Allen McLain Hamilton, in his "System of Legal Medicine," has criticized the testimony of medical experts, and especially the usual hypothetical question, and if he were to express himself since the celebrated Harry Thaw trial he would use more vigorous language than he used at the time of writing his "System of Legal Medicine." He says:

"Much criticism has been indulged in by the courts as to the value of expert evidence. Lord Campbell's remark in the case of the *Tracy Peerage,* 10 C. L. & Fin., 191, has been often quoted to the effect that the skilled witnesses come with such bias on their minds to support the cause in which they are embarked that hardly any weight should be given to their evidence."

And again:

"Attention has been elsewhere directed to the appearance of expert witnesses in courts of law, and the difficulties and abuses which attend the introduction of this kind of testimony have been pointed out. Much of the disrepute into which hired testimony has fallen is undoubtedly due to a kind of partnership which many men find it difficult to avoid, for the engagement of their services implies a bid for actual help in advancing a side by the building up of theories or reasons for the support of a more or less tenable position. If the expert be careless of his reputation, weak or corrupt, he will lend himself to the side of the case upon which he has been retained, and in reality he becomes a pleader, prostituting his knowledge, stretching a point, or burying his conscience.

"If he is not absolutely free his sympathies will be appealed to. It therefore becomes him to avoid espousing the cause of any side.   *   *   *   In other words, the medical witness who is called to give his opinion regarding the facts submitted to him should emulate the judge upon the bench in his impartiality."

It is undoubtedly true, as stated by this eminent alienist, that so-called medical expert testimony is growing into disrepute be-

fore the courts of this country, and it is not strange that juries are often disposed to give little credit to it.

After reading the entire record, the court has reached the conclusion that the jury reached, to-wit, that Philip Kiner's death was caused by the injuries received at the time of the accident. It is not necessary that the injuries received should be the sole and only cause of death, but if they were the primary cause, or if they contributed to produce the condition which caused the death, it would be sufficient.

The expert physicians themselves admit that the·heart trouble of which Kiner died might have been the secondary cause. Not only so: Dr. Harding testifies that "if the rib was fractured directly over the heart, and that rib in any way pressed the covering of the heart, there might be a possibility of an injury there to the heart, and that such an injury might produce endocarditis," the disease of the heart of which Kiner died.

Considering the whole record as it comes to this court, having carefully read it with a view to determining whether error intervened as claimed, the court is not impressed with the contention of the plaintiff in error that the verdict of the jury was against the weight of the evidence, or that the judgment was contrary to law.

We have reached the conclusion that the verdict of the jury was supported and warranted by the evidence, and that the court committed no error in rendering judgment thereon, or in overruling the motion for a new trial. The court finds no prejudicial error in the record, and the judgment is affirmed, with costs, but without penalty, and the cause will be remanded for execution. Exceptions noted.