McDONALD, APPELLANT, *v.* THE HAUGHTON ELEVATOR & MACHINE CO., APPELLEE.

(Decided July 5, 1938).

*Messrs. Doyle & Lewis, Mr. George J. Gould* and, *Mr. Lehr Fess,* for appellant.

*Messrs. Marshall, Melhorn, Davies, Wall & Bloch, Mr. W. A. Belt* and *Mr. Arnold F. Bunge,* for appellee.

OVERMYER, J. Appellant, Thomas C. McDonald, who was plaintiff below, brought an action against The Haughton Elevator & Machine Company to recover damages for injuries sustained on December 12, 1934, in an electrically operated elevator in Stein's department store in the city of Toledo. Issue was joined and on trial, at the close of plaintiff's case, the court directed a verdict for defendant upon which judgment was entered. This appeal is prosecuted to reverse that judgment.

Appellant was an employee of Stein's store, at the time above noted, as personnel superintendent. He had been employed there for some ten years. On the occasion in question, at about 8:30 p. m., he and the night watchman and a lady employee were in the building. The store was closed for business, no lights were burning on the first or main floor except one 15-watt bulb in the 14-foot ceiling above the elevator, and that floor was quite dark. In the course of the evening the watchman was taking one of the two elevators in the rear of the store from an upper floor to the basement. When the elevator had descended to a point from 18 inches to 2 feet below the level of the first floor, it stopped. The watchman tried to make it operate and was unable to do so. It afterwards developed that a shaft had broken in a torque motor, one of several motors designed to level the elevators when stopping at various floors.

The watchman thereupon turned off the dome light in the elevator, stepped out onto the first floor, closed a collapsible door or gate attached to the elevator, leaving the elevator itself dark and leaving open a solid

metal door attached to the building, which if closed
would have effectively prevented entrance to the eleva-
tor without a special key. The watchman then took the
companion elevator, next to the one referred to, and
went to the basement. Shortly thereafter the appel-
lant, from an upper floor, rang for the elevator and the
watchman ascended with the operating elevator to the
upper floor and took appellant and the lady employee
to the basement, where they did a few minutes check-
ing of goods, whereupon all three re-entered the ele-
vator to ascend to an upper floor. Thereupon, accord-
ing to the testimony of the appellant, the following oc-
curred:

"A. And then I got on the car and said to Christ
(the watchman) 'Where is the other car?' He said
'On the first floor.'

"Q. When you got to the first floor, tell us' what
happened? A. I stepped off, went to the other car.
The cars was right next to each other. I opened the
collapsible gate with my right hand, shoved it back. I
reached in to put on the light, lost my balance and—

"Q. Your reaching in, Mr. McDonald, opening the
collapsible gate with your right hand, did any time
elapse between those two motions? A. No, sir, prac-
tically one motion. * * *

"When you approached that elevator, the outer door
was open? A. Yes, sir.

"Q. And the lights on the elevator? A. Out.

"Q. And the bronze gate? A. That was closed."

On cross-examination he testified:

"Q. He (the watchman) told you it was on the first
floor 'on the bum,' didn't he? A. The substance of
that. He said he could not start it.

"Q. And then you told him to leave you out on the
first floor and you would see if you could start it, or
use the car, or something to that effect? A. I said
'I will start it,' I believe. * * *

"Q. Now, of course, Christ (the watchman) was hired by you, is that correct? A. Yes, sir.

"Q. You had full control over him while he was working in the store? A. Yes, sir.

"Q. The light then did not illuminate inside of the elevator at all? A. No, sir.

"Q. You could not see any part of the elevator floor when you approached the elevator? A. I could not see the floor. I did not see the floor.

"Q. Now, after you opened the gate you did not see the elevator floor? A. When I opened the gate I was interested in putting the light on. * * * I was paying no attention to the floor."

When the building in which Stein's is located was erected, the appellee, The Haughton Elevator & Machine Company, installed the elevators, and at the time herein referred to there was in effect a written maintenance contract between Stein's and the appellee whereby the appellee agreed:

"Under the terms and conditions of this contract we will maintain the entire elevator equipment as herein described, using skilled elevator maintenance men under our direct employment and supervision. They will employ all reasonable care to see that the elevator equipment is maintained in proper and safe operating condition. * * * for $53 per month."

It is undisputed that by the provisions of the contract the appellee was subject to call at any hour of the day or night to make repairs or adjustments on the elevators. Appellant testified that as superintendent he issued orders to all employees to turn off the dome lights when an elevator was not in use and to leave the heavy outer door open. There is evidence that the elevator in question had been giving some trouble in that motors and mechanism controlling the levelling at floors did not always work properly, and the appellee had been called at various times to inspect and adjust the same.

Appellant's claims, according to the petition, are based on alleged "failure to construct and install adequate equipment; failure to replace and/or repair, inspect and remedy the known defective conditions, particularly in failing to replace the motor which broke, with a larger, more adequate and safe motor."

The chief error assigned is the direction by the trial court of a verdict for the defendant, but other errors are assigned relating to the overruling of appellant's motions to strike certain matters from the second amended answer; overruling a demurrer to the second defense of the answer; error in admitting a certain photograph of the elevator in question; and in other respects in the admission and rejection of evidence.

Appellant contends that the appellee is to be held to the degree of care applied to a common carrier. Such may be the rule as applied to passengers while the elevator is in service, but no such rule would apply to the situation and circumstances here involved. Further, the appellee is not an operator of elevators and is not engaged in business as a common carrier of passengers for hire. It manufactures and installs elevators and may, as in this case, have a contract to keep them in repair. But this does not make of it a common carrier, rather a manufacturer of an article not "imminently dangerous" or "inherently dangerous."

It is further claimed by appellant that the doctrine of *res ipsa loquitur* is here invoked. With this we do not agree. The outstanding test to be applied on that question is control of the instrumentality that caused the injury, at the time of injury. Applying that test here makes argument unnecessary. *Glowacki* v. *North Western Ohio Ry. & Power Co.,* 116 Ohio St., 451, 157 N. E., 21; *Walker* v. *Toledo Hotel Co.,* 59 Ohio App., 229, 17 N. E. (2d), 422.

Under the law, and under the contract between the parties, what was the duty and liability of the appellee owing to appellant?

The appellee was an independent contractor, contracting to keep the elevators in repair for a stipulated sum per month. Under the contract it agreed to exercise "reasonable care" to keep the elevators in repair and in safe operating condition.

"Duties of independent contractor contracting to keep elevators in repair must be measured by rules applicable to manufacturers and sellers." *Dahms* v. *General Elevator Co.*, 214 Cal., 733, 7 P. (2d), 1013,

Among the safety equipment provided by the appellee in the manufacture and installation of these elevators was an automatic electric brake, designed to bring the elevator car to an immediate stop when an accident occurred, such as the breaking of a shaft in a torque motor. On the occasion in question this brake functioned perfectly. When the shaft in the housing of the motor broke, the car stopped at once. Therefore, the equipment functioned as it was intended to function. No one was injured by the breaking of the shaft, nor by the stopping of the car. The operator tried to start it and could not, whereupon he did what appellant had ordered him to do—turned off the dome light, closed the folding grated door, and left the solid door open. Under the contract, appellee was subject to call at once to come and ascertain the trouble. Instead, after being warned that it was "on the bum," appellant said "I will start it," and in the dark opened the folding door and groped for the light switch and, he says, "lost his balance."

Appellant in his reply brief states the pertinent question to be: "What caused plaintiff to lose his balance?" He then argues that it was caused by appellee's negligence in locking the elevator eighteen inches or more below the floor of the store, the light button thereby being that much lower than if the car had been at floor level. By the same token, the top of the collapsible gate was also eighteen inches lower, and the testimony showing the door opening to be

seven feet, it follows that the top of the door or gate must have been at or near appellant's face or forehead.

There was no privity of contract between appellee and appellant. No duty owed by appellee to appellant had been violated. Voluntarily assuming a duty resting upon appellee under its contract, of which contract he had knowledge, the appellant approached the elevator in the dark, opened the elevator door and fell into the opening. By what rule of law could the manufacturer of the elevator be held to be required to foresee and expect such "probable" consequences? "There must be knowledge of a danger, not merely possible, but probable." *MacPherson* v. *Buick Motor Co.*, 217 N. Y., 382, 111 N. E., 1050, Ann. Cas. 1916C, 440, L. R. A. 1916F, 696; *White Sewing Machine Co.* v. *Feisel*, 28 Ohio App., 152, 162 N. E., 633.

The evidence shows that the motor shaft broke within the housing. "Reasonable care" in the inspection of the equipment might, by the use of delicate instruments, according to one witness, have discovered its weakness or defect, and might not. But how can it be said that the breaking of that shaft was the *proximate* cause of appellant's injuries? If the appellant were the watchman and the electric automatic brake had failed to operate and the car had dropped to the bottom and injured him, quite a different question would be presented, and nearly all elevator cases involve either actual passengers or actual operators. How could a manufacturer of elevators reasonably foresee. a set of circumstances such as resulted in appellant's injuries? The natural and expected result to be anticipated by the manufacturer on failure of the torque motor was the instant stopping of the car. It did stop, and at that point the manufacturer's duty in that respect ended. What happened thereafter, and what was done by the night watchman and the appellant, which resulted in appellant's injuries, was within their sole control, and appellee had nothing to do with it.

" * * * the injury of which the plaintiff complains must have been the natural and proximate consequence of the wrongful act or omission. * * * the law regards only the direct and proximate results of the negligent act as creating a liability against the wrongdoer. It does not regard an injury from a remote cause. * * * the wrongdoer * * * is responsible only for the proximate, and not for the remote, consequences of his actions." 29 Ohio Jurisprudence, 469 *et seq.,* and cases cited.

The trial court was correct in its application of the law to the facts shown by appellant's evidence. Under the evidence no breach of duty on the part of appellee toward appellant appeared; and even if shown it could not have been the proximate cause of appellant's injuries. The judgment was correct upon this theory, and other errors complained of, if found to be errors, would not have affected the determination of this legal question.

The judgment will be affirmed.

*Judgment affirmed.*

LLOYD and CARPENTER, JJ., concur.