OPINION
By BARNES, J.
The above entitled cause is now being determined as an error proceeding by reason of plaintiff’s appeal on questions of law from the judgment of the Court of Common Pleas of Clark County, Ohio.
The case arose in the Common Pleas Court upon a petition filed by the plaintiff-administratrix, asking for damages as the result of the claimed wrongful death of her husband when a boiler manufactured by the defendant company and being used by the Aetna Rubber Company, of Cleveland, collapsed and scalded plaintiff’s decedent to death.
The cause came on to be heard upon the issues joined by plaintiff’s petition and the defendant’s answer.
At the conclusion of all the evidence, the court directed the jury to return a verdict for the defendant.
Plaintiff’s petition, in substance, alleged that on or about July 22, 1937, near 4:45 o’clock in the afternoon, while plaintiff’s decedent was in the employ and on the premises of his employer, the Aetna Rubber Company, of Cleveland, Ohio, a certain Scotch marine boiler, manufactured by the defendant and sold to the said Aetna Rubber Company, collapsed and a circulating tube which had been welded by the defendant into said boiler cracked, and as a direct result, plaintiff’s decedent was scalded by steam and died on the following day as the result of the serious and fatal burns so sustained. It was further alleged that the fatal injuries were due solely to the negligence of the defendant, The James Leffel and Company, in its construction of the boiler in the following particulars—
“1. It negligently and recklessly failed and neglected to weld and fuse said circulating tube to said boiler in accordance with the or *459 dinary, usual and accepted practice among manufacturers of boilers in and about the State of Ohio:
2. Negligently and recklessly failed and neglected to weld and fuse said circulating tube into said boiler in accordance with the rúles and regulations of the Ohio Boiler Code;
•3. Negligently and recklessly failed and neglected to perform said welding and fusion by means ¡of a coated rod so as to prevent ¡oxidation and poor fusion, but on the contrary employed a bare rod, resulting in the oxidation of the metal and defective fusion;
4. Negligently and recklessly failed and neglected to stress relieve around and about said weld so as to prevent weakness or lack ■of tensile strength around said weld;
5. Negligently and recklessly failed and neglected to employ bolting to provide strength in the vicinity of said weld;
6. Negligently and recklessly manufactured and sold a boiler of such construction and design that the heat was concentrated at a single point on the heating plate, causing unequal expansion and collapse of the boiler;
7. Negligently and recklessly failed and neglected to provide adequate rivets on the heating surface of said boiler to prevent the weakening thereof;
8. Negligently and recklessly manufactured and sold a boiler with a frail and inadequate collapsible heating plate or surface;
9. Negligently and recklessly failed and neglected properly to inspect said boiler before selling or offering the same for sale;
10. Negligently and recklessly failed and neglected to warn plaintiff’s decedent or the persons likely to be in the vicinity . of said boiler, of the dangers to which it was then and there subjecting them;
11. Negligently and recklessly failed and neglected to equip said boiler with a high and low water alarm or whistle to warn of lack or excess of water, contrary to the established custom and practice among boiler manufacturers in and about Ohio;
12. Negligently and recklessly failed and neglected to examine, test and inspect said weld by means of radiograph to ascertain the strength and character of the weld;
13. And negligently and recklessly represented that the capacity of said boiler was far in excess of its actual capacity, well knowing that said representations would mislead persons using said boiler.”
The numbering of the above specifications of negligence is ours, and does not so appear in the petition.
Defendant’s - answer, after certain formal admissions, was in the nature of a general denial.
No evidence was introduced bearing on specifications of negligence 5, 6, 7, 8, 10, 11 and 13.
Counsel for appellant in their brief give particular emphasis to the electric weld by which a circulating tube, 8 inches in diameter and running vertically through the furnace about 18 inches from the rear of the furnace, was welded to the upper and lower plates, and designed to aid in the circulation of the water.
This tube was inserted into the fire box by first burning two holes into the top and bottom with an acetylene torch, and then inserting this .tube into these holes, where they were welded in place by means of the electric arc weld. This weld was known as a fusion type weld; that is the metáis were *460 allowed to be heated to such a degree that they flowed together and would make a solid union. The boiler was cylindrical in shape, with the Are box in the center of the cylinder. The cylinder walls were made from corrugated steel. The corrugations were for the purpose of adding strength.
The trial court directed a verdict for the defendant upon two grounds — •
1. That there were no contractual relations between plaintiff’s decedent and the defendant, and that the undisputed evidence did not bring the case within the exception to the general rule.
2. That there was no direct evidence, nor any evidence, from which an inference would arise that any of the claimed acts of negligence was the proximate cause of the boiler explosion and the accident resulting in the death of plaintiff’s decedent.
The courts in this state, as well as in other jurisdictions, rather uniformly assert as a general rule that where there is no contractual relation between the person injured and the instrumentality bringing about the injury, there is no liability. This announcment is made in the case of The White Sewing Machine Company v Fiesel, a minor, 28 Oh Ap 152. The first syllabus reads as follows'—
“1. It is a general rule of law that manufacturer or seller is not liable to third persons with whom he had no contractual relations for negligence in manufacture or sale of article.”
In this case, however, the court found that the conditions there presented constituted an exception to the general rule, and supported the judgment for the injured minor. The second syllabus reads as follows—
“2. Manufacturer of electric sewing machine is liable to members of family residing in buyer’s home, irrespective of contract, for negligence in failure to use ordinary care in manufacture and inspection to the end that article may be properly insulated, since danger to members of family from defective applicance should be foreseen.”
In the American Law Institute, in the Restatement of the Law of Torts, Chapter 14, paragraph 398, page 1073, we find the following—
“A manufacturer who fails to exercise reasonable care m the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured.”
We also quote from 111 A. L. R., 1240,—
“The exceptions to the so called general rule that the manufacturer is not liable to a third party who has no contractual relation with him, for negligence in the manufacture or sale of the article which he handles, have been regarded as so numerous and so important that it may be doubted whether the above principle should be regarded as the general rule.”
Reference is also made to the following decisions,—
Lenz v Standard Oil Co. (New Hampshire) 186 Atlantic, 225;
Lill v Murphy Bed Co. (Illinois), 8 N. E., 2d, 714;
*461 Sheward v Bullock’s, Inc., 120 Pacific, 142.
We determine that under the facts of the instant case it would be improper to deny plaintiff’s recovery on the ground that no contractual relations existed between decedent and the defendant company.
The boiler constructed by the defendant company and sold to its customer, was a dangerous instrumentality if due .care was not used in the selection of material and fabricated into the finished product. Injury to the engineer (in this case the decedent) from defective construction should be foreseen.
On the second question as to proximate cause, we are in accord with the trial court, and thereby hold that the court was right in directing a verdict for the defendant.
The uncontradicted evidence in the case discloses that the collapse of the boiler was not due to any of the claimed acts of negligence set out in the petition. On the other hand, the collapse was occasioned wholly by its negligent operation. The boiler had been in operation for about two months and ten days prior to the accident. It is conclusively shown that a deposit of solid matter was allowed to accumulate in the bottom of the plate immediately above the fire, which was from three-fourths to an inch in thickness. This was' the result of feeding contaminated water into the boiler. The substance contained among other things, oil. By adhering to the plate, it so insulated the inside of the boiler that the water and steam therein would not adequately cool the plate.
The fire in the fire box in its operation directed the flame against the plate, which was thus insulated. This caused the plate to fold, by first getting red hot and then sagging or bagging down. This sagging or bagging would first appear towards the front of the boiler where the fire was the hottest, and then would carry on towards the rear. When this sagging or bagging reached the 8 inch' tube heretofore referred to, and located 18 inches from the rear of the boiler, it checked the sagging by reason of the fact that the tube located as it was would act as a brace. At this point the plate folded down along the edge of the 8 inch tube and finally tore loose. In so doing the part of the welding was torn loose and the plate opened for a distance of about 8 inches towards the front. From this opening hot water and steam emerged, came out the front, striking plaintiff’s decedent and inflicting burns from which he died on the following day.
Following the accident, the Cleveland company made arrangements with the defendant company to re-build the boiler, and shortly thereafter it was sent to the Springfield plant of the company.
After the explosion the boiler was examined by the chief of Ohio Boiler Inspectors, and two or three assistant inspectors. From this inspection expert evidence was presented as to the character and cause of the explosion.
Plaintiff sought to show that the failure of the weld connecting the 8 inch tube with the boiler was an efficient, producing cause of the collapse of the boiler, and, further, that the welding operation was not performed according to approved methods. One witness called by counsel for plaintiff was James Raymond Stitt, a student professor of welding engineering at the Ohio State University, and in *462 charge of the welding engineering curriculum. Counsel for plaintiff procured from the defendant company a section of this welding and placed it in the hands of Professor Stitt for examination. He testified that the sample left with him showed a gas pocket and also some pits and that in his judgment the welding operation was not properly performed. He further testified that the defects which he found would have a tendency to weaken the weld. However, in cross-examination he testified that the parts of the weld submitted to him had not failed. The word “failed” seems to have been used very generally by the engineering experts, and means that it remained in position and performed the function which it was intended to perform.
At the time of this accident Mr, Carl O. Myers was Chief Inspector of Boilers for the State of Ohio. Immediately following the explosion, he was advised of the accident by one of the assistant inspectors then living in Cleveland. When the boiler was returned to Springfield, Mr. Myers made an examination and a written report to The Industrial Commission. This report was introduced in evidence. Among other things, the report states,—
“Opposite the point, where the side of the furnace collapsed, there was a slab of this scale and binder stuck to the plate about one inch thick and appeared like a heavy grease. The cause of this furnace collapse was that this substance deposited itself on the top and side of the furnace and resisted the transfer of heat through the plate into the water, causing the plate to become overheated to the extent that the tensile strength was reduced to a point where it would not withstand the pressure.”
Later in the report we find the following,—
“Failure of the weld attaching the circulating tube to the furnace wall was secondary, but nevertheless caused the fatalities.”
Counsel for plaintiff urge that this second part of the report above quoted presents evidence of probable cause. Standing alone, this quoted portion of the report presents a query as to just what was meant. However, Mr. Myers was called as a witness and through his testimony this part of the report is clarified. He was asked the following question,—
“Was it your opinion the welding around that circulating tube had anything to do with causing the collapse?”
His answer was—
“Oh, definitely not; it couldn’t have.”
In cross-examination his attention was called to this particular statement which he made in his report. The sum and substance of his explanation was that the opening up at the weld and extending towards the boiler a distance of 8 inches, was the cause of letting cut the steam and the resultant fatal injury. However, he made clear that the breaking off of a part of the weld was not due to any inherent defects, but was caused by the plate folding down in front of the 8 inch tube and causing the rent.
Complaint was made that the weld had not been tested for bending or tensile strength. On this question the witnesses all testified that under normal operations this weld was not subject to bending of tensile stress, but on the other hand served no other purpose than *463 sealing the hole so that it would not leak.
Claim was also made that this boiler was a special design, and. under the law and attending rules, it was necessary to have the same approved by the State authorities before it could be manufactured. This contention was not adequately ■ met through the evidence. In any event, it could not be said to be a proximate cause of the accident.
It is also urged that the boiler was not properly inspected before it was shipped to its Cleveland purchaser, tinder the law of Ohio no boiler may be constructed except under supervision and inspection of a boiler inspector. There is the further requirement that when installed it may not be operated until again inspected by a duly authorized inspector. The evidence disclosed that all these conditions were complied with. The argument is presented that the state inspection should not relieve the manufacturer from negligent construction, even though the same may have been overlooked by the State Inspector. We think this contention is correct, but again we are confronted with the question of probable cause. The undisputed evidence in this record discloses that neither this boiler nor any of its parts failed by reason of any negligence in construction. The record does show that the failure Vías due to improper operation. The collapse of the boiler was due to the sediment which entered the boiler from filling with contaminated water. When the plates of the boiler began to sag, it was doomed.
The judgment of the trial court will be affirmed, and costs in this court adjudged against the appellant.
GEIGER, PJ., & HORNBECK, J„ concur.