### MORAN v. PITTSBURGH–DES MOINES STEEL CO. et al.

### No. 9505.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 21, 1948.

Decided Feb. 26, 1948.

[12] Williston on Sales, Vol. 2, 2d Ed., § 608(a), p. 1522.

[13] Williston on Contracts, Revised Ed., Vol. 5, § 1462, p. 4089.

See also, D.C., 6 F.R.D. 594.

Marvin C. Harrison, of Cleveland, Ohio (Harrison, Thomas, Spangenberg & Hull, of Cleveland, Ohio, and Premo J. Columbus, of Pittsburgh, Pa., on the brief), for appellant.

Carl E. Glock, of Pittsburgh, Pa. (James R. Orr and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., on the brief), for appellees.

Ella Graubart, of Pittsburgh, Pa., amica curiæ.

Before MARIS, GOODRICH, and O'-CONNELL, Circuit Judges.

GOODRICH, Circuit Judge.

Plaintiff sues as administratrix of the estate of her husband, Patrick J. Moran. The defendants are Pittsburgh-Des Moines Steel Company, a partnership, John E. Jackson, a member of the partnership, and Pittsburgh-Des Moines Company (hereinafter referred to as the Corporation).

The subject matter of the suit is the recovery of damages occasioned to the plaintiff by the death of her husband in an accident which took place in the City of Cleveland, Ohio, on October 20, 1944. The basis of the defendants' alleged responsibility for that accident will appear in the course of the discussion. Suit was brought in the District Court for the Western District of Pennsylvania.

Federal jurisdiction is based solely on diversity of citizenship. We have, therefore, the now familiar situation in which the federal court applies state law and takes its law from the authoritative decisions of the state where the action is brought.[1] This reference includes that state's conflict of laws rules in situations where operative facts have occurred across state lines.[2] The general rule of reference here is plain enough on the Pennsylvania authorities. We have an occurrence where all the operative facts have an Ohio setting. Pennsylvania, in such cases, follows the general rule of referring to the place of wrong for the legal effect to be given the facts and events.[3] Likewise, the application of Pennsylvania conflict of laws rules determining whether a given question is to be characterized as substantive, with reference to the foreign law, or procedural, where the reference will be to the law of the forum, controls us here.[4] This statement is, of course, subject to those rules gradually being worked out with regard to the characterization of given questions for the state law or federal law for the appli-

---

[1] See Note, How a Federal Court Determines State Law, 59 Harv.L.Rev. 1299 (1946).

[2] Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Griffin v. McCoach, 1941, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, 134 A.L.R. 1462; Boyle v. Ward, 3 Cir., 125 F.2d 672; Miller, Inc. v. Needham, 3 Cir., 1941, 122 F.2d 710; see Wolkin, Conflict of Laws in the Federal Courts: The Erie Era (Pub. for the Association of American Law Schools by the Practising Law Institute) p. 47 (1947).

[3] Sumner v. Brown, 1933, 312 Pa. 124, 167 A. 315; Smith v. Pennsylvania R. Co., 1931, 304 Pa. 294, 156 A. 89; Klumph v. Dunn, 1871, 66 Pa. 141, 5 Am. Rep. 355; Levinson v. McCoury, 1932, 104 Pa.Super. 135, 159 A. 55; Wilson v. Pullman Co., No. 2, 1917, 65 Pa.Super. 508; see Restatement, Conflict of Laws (1934) §§ 378, 379. The Pennsylvania law accords with the Restatement. See Restatement, Conflict of Laws; Pa.Annot. (1936) §§ 378, 379.

[4] Sampson v. Channell, 1 Cir., 1940, 110 F.2d 754, certiorari denied 1940, 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415.

cation of the Erie Railroad v. Tompkins[5] rule regardless of their characterization in two state conflict of laws situations.[6]

After a long trial in which the plaintiff's case was fully developed, the District Court, on defendants' motion, granted an involuntary nonsuit and dismissed the action. The plaintiff appeals and the appeal, under these circumstances, calls for the application of the familiar principle that the plaintiff's evidence and inferences legitimately to be drawn from it must be taken at face value. The only question is whether plaintiff has made out a case which should have been submitted to a jury.

The tragic accident in which Patrick Moran and others lost their lives was a poignant episode in the development of the kind of bold and ingenious engineering for which Americans have become famous. We all enjoy the benefits of the results of these experiments; the question which courts have to decide is at whose risk they are to be carried on. The story of the development of facts leading up to the lawsuit may be briefly told.

The East Ohio Gas Company is an operating public utility engaged in selling natural gas for both industrial and consumer use in the City of Cleveland, Ohio. A problem presented in distribution was the insufficiency of the gas supply to meet consumer demand at periods of peak load. This occurred largely in the winter when the use of gas for heating purposes was at its height. At the time of these events there was evidently an abundance of natural gas and the problem was one of storage at a point where it would be immediately available to meet the consumer demand. A plan was worked out for the storage of this gas at a temperature of 260° below zero F., at which point it becomes liquid. The condensation in volume is so great that 600 cubic feet of the natural gas becomes one cubic foot of the liquid. The obvious problem was a method of storage by which the "liquefied gas" could be kept at this exceedingly low temperature. The method worked out consisted of a giant thermos bottle type of structure in which one steel tank was built inside an outer tank and a thick layer of insulating material put between them.[7] In 1940 East Ohio entered into a contract with the Gas Machinery Company for the construction of a liquefaction and storage plant. That company let out portions of the contract to various concerns. The defendants put up three storage tanks as their part of the construction. These were spherical in form and built on the principle just described. So far as the record shows, these tanks functioned with satisfaction.

The success of this storage venture and the increased demand for gas led East Ohio, in 1942, to look to a further expansion of storage facilities for "liquefied gas." The new tank to be built was to have the storage capacity of two of the earlier ones. There is evidence in the

5 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487.

6 See, e.g., Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L. Ed. 2079, 160 A.L.R. 1231 (state statute of limitations); Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 145 A.L.R. 719 (burden of proof); Stoner v. New York Life Ins. Co., 1940, 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284 (sufficiency of proof); see Wolkin, Conflict of Laws in the Federal Courts: The Erie Era (Pub. for the Association of American Law Schools by the Practising Law Institute) pp. 47, 57-67 (1947); 20 B.U.L.Rev. 566 (1940); 53 Harv.L.Rev. 1393 (1940); 29 Calif.L.Rev. 228 (1941).

7 The East Ohio plant consisted of a liquefaction section, storage tanks, and a re-gasification unit. The natural gas was piped in from the supplying fields to Cleveland. After the moisture and carbon dioxide were removed the gas was compressed at about six hundred pounds per square inch. The heat of compression was taken out by the "cascade" system which uses the technique of cooling the gas by first using water to cool ammonia and then the ammonia is used to cool ethylene which chills the natural gas. Then the pressure on the natural gas is released and this further chills the gas so that a large part of it becomes liquefied. The "liquefied gas" is then stored in these thermos bottle-like tanks until there is a need for it. At that time it is re-gasified and fed into the supply lines.

For a more technical description of these tanks see the patent applications filed thereon. Jackson Patent 2,328,647, Jackson-Cooper Patent 2,329,765, Jackson Patent 2,386,958.

record from which a jury could find that the defendants undertook, with the East Ohio Company, to furnish the material and construct this tank, although the formal contract was made with the Gas Machinery Company and East Ohio and, in turn, Gas Machinery Company and defendants. The explanation of this arrangement was that Gas Machinery Company had certain rights to a commission.

The new tank, it was concluded, was to be in the form of an upright cylinder instead of a sphere. There is testimony in the record to the effect that this decision was reached upon the recommendation of the defendants who stated that the cylindrical form would be as efficient as the spherical form and considerably cheaper. One theory of the plaintiff's case here rests upon the alleged defects in design, workmanship, and materials of this tank, a matter which will be discussed hereafter. Tank No. 4 was completed in May, 1943. Defendants were called in to supervise the first filling. After this was done they were paid and left the job. All went well for nearly thirteen months. On the afternoon of October 20, 1944, No. 4 tank ruptured and gas escaped in great quantities. There was a fire, explosions, and a frightful disaster in which lives were lost and property destroyed. One of the lives was that of the plaintiff's decedent, who worked for the East Ohio Company, but not in the operation connected with this liquefaction and storage of gas.

The plaintiff presents two alternative theories claiming recovery on either one of them. The first is that this storage of "liquefied gas" was, under Ohio law, a "nuisance" and the defendants are responsible as the creators of the nuisance. We have given thoughtful consideration to this theory, but our conclusion is that we cannot accept it. The basis of the confusion in the argument is, we think, the not uncommon cloudiness found in the law and elsewhere in the use of words.[8] There is a well recognized doctrine in the law which found a full exposition in the famous English case of Rylands v. Fletcher[9] which imposes liability on a land occupier who collects on his premises things which are apt to do harm if they escape. The law imposes insurer's liability, or almost insurer's liability, upon the occupier in such case for the harm done to his neighbors for the escape of the dangerous substance. The rule and its limitations are well recognized and generally classified today under the heading of ultrahazardous activities,[10] or some such descriptive phrase.[11] Ohio decisions have imposed this responsibility for a good many years.[12]

Sometimes courts, clear as to the result to be reached, but not always happy in the words used to describe it, have talked the law of nuisance in this connection and it must be admitted that there is some language in the Ohio cases using this terminology.[13] But the basis for liability

---

[8] "We should have a great many fewer disputes in the world if words were taken for what they are, the signs of ideas only, and not for things themselves." John Locke, Essay Concerning Human Understanding (1690).

[9] [1868] L.R. 3 H.L. 330, 37 L.J.Ex. 161, 19 L.T.Rep. 220. An interesting up-to-date discussion will be found in Eldredge, Modern Tort Problems (1941).

[10] See Restatement, Torts (1938) § 520.

[11] A few of the more common ones are: "liability without fault"; "absolute liability"; "activities which one carries on at his peril". See Smith, Liability for Substantial Physical Damage to Land by Blasting—The Rule of the Future, 33 Harv.L.Rev. 542, 667 (1920); Tort and Absolute Liability—Suggested Changes in Classification, 30 Harv.L.Rev. 241, 319, 409 (1917).

[12] Bradford Glycerine Co. v. St. Mary's Woolen Mfg. Co., 1899, 60 Ohio St. 560, 54 N.E. 528, 45 L.R.A. 658, 71 Am.St. Rep. 740 (Nitroglycerine); Defiance Water Co. v. Olinger, 1896, 54 Ohio St. 532, 44 N.E. 238, 32 L.R.A. 736 (escaping water); see Interstate Sash & Door Co. v. Cleveland, 1947, 148 Ohio St. 325, 326, 74 N.E.2d 239, 240; Metzger v. Pennsylvania, O. & D. R., 1946, 146 Ohio St. 406, 409, 66 N.E.2d 203, 205; Taylor v. City of Cincinnati, 1944, 143 Ohio St. 426, 434, 55 N.E. 2d 724, 728, 155 A.L.R. 44.

[13] E.g. Taylor v. City of Cincinnati, 1944, 143 Ohio St. 426, 55 N.E.2d 724; Gaines v. Village of Wyoming, 1947, 147 Ohio St. 491, 494, 72 N.E.2d 369. In the Taylor case, urged upon us by appellant, there is no confusion in the court's mind

is not really nuisance, a wrong in itself for which equitable relief against continuance would be appropriate.[14] The basis of liability, instead, is the conclusion that when a man does something extraordinarily dangerous which creates an unusual risk to his neighbors he should bear the consequences when that risk ripens into harm.[15] Not only is this the now orthodox explanation of the basis of liability, but we think it is perfectly consistent with the Ohio decisions. These decisions suggest the imposition of liability where one collects and keeps on one's premises anything inherently dangerous or likely to do mischief if it escapes, which escaping, injures another in the enjoyment of his legal rights.[16] Originally the Ohio cases made a distinction between those substances "at all times, in all places, and under all circumstances, dangerous" which are made for their dangerous qualities and those that may be dangerous if not stored properly but are used for other than their dangerous capabilities.[17] Now the Ohio rule weighs the various factors in the manner suggested by the Restatement[18] and liability depends upon the degree of potential injury compared with the utility and common usage.[19]

---

in its detailed discussion of the problem. The Restatement of Torts is quoted at length and the analysis therein followed. Judge Hart says: "Confusion exists in statements of the legal basis of liability as applied to the law of nuisance because the term 'nuisance' has been used indiscriminately to designate the harmful results, * * * ." Taylor v. City of Cincinnati, 1944, 143 Ohio St. 426, 55 N.E.2d 724, 729.

[14] The American courts have shown a deplorable tendency to call everything a nuisance, and let it go at that. Strictly speaking "nuisance" has reference to the type of interest invaded and not to any particular type of conduct from which the invasion results. A nuisance, therefore, may be created by conduct which is intended to inflict harm, by negligence or, in many cases by an extrahazardous activity. See Scope and Introduction Note to Chapter 40, Restatement, Torts (1939).

[15] "The possibility of a great danger has the same effect as the probability of a less one, and the law throws the risk of the venture on the person who introduces the peril into the community." Holmes, The Common Law (1938) p. 154.

"It [Rylands v. Fletcher] recognizes degrees in dangers, no action is prohibited unless it is immediately injurious to the person or property of another or so dangerous as to actually affect the value of his property, but at the same time it recognizes that there are certain dangerous activities which, while the dangers incident thereto are not so great as to require their prohibition, should be carried on only at the risk of him who profits by them." Bohlen, Studies in the Law of Torts (1926) p. 416; see Stallybrass, Dangerous Things and the Non-Natural User of Land, 3 Camb.L.J. 376, 387 (1929). See the well considered language in Exner v. Sherman Power Const. Co., 2 Cir., 1931, 54 F.2d 510, 80 A.L.R. 686.

[16] Taylor v. City of Cincinnati, 1944, 143 Ohio St. 426, 55 N.E.2d 724. "This is the doctrine of the early case of Rylands v. Fletcher (1868) L.R. 3 H.L., 330, 37 L.J.Ex., 161, 19 L.T.Rep., 220, 33 J.P. 70, which, with modifications, has been adopted as the common-law rule in many jurisdictions of this country. The rule in question, which is being gradually narrowed in scope, has been considered and, in proper cases, applied to situations involving the maintenance of artificial reservoirs for the collection of water as distinguished from mill dams across flowing streams; the storing or use of dangerous combustibles, such as dynamite, nitroglycerin, gun powder, etc.; blasting operations on one's own land adjacent to the premises of another; and trespasses due to the escape of wild animals, as distinguished from domestic animals." 1944, 143 Ohio St. 426, 435, 55 N.E.2d 724, 728.

[17] Langabaugh v. Anderson, 1903, 68 Ohio St. 131, 67 N.E. 286, 62 L.R.A. 948.

[18] "§ 520. Definition of Ultrahazardous Activity.

"An activity is ultrahazardous if it

"(a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and

"(b) is not a matter of common usage." Restatement, Torts (1938) § 520.

[19] Thus the cases cited by the defendants to the effect that storage of a certain substance does not bring one into the field of liability without fault have little bearing on the problem at hand until we have in mind what was stored, under what conditions and whether it was something of common use. Cf. Northwestern Ohio Natural Gas Co. v. First Congregational

■ The liability imposed by this "ultrahazardous activity" doctrine is one imposed on him when he engages in such activity. Usually it is a land occupier, although it may be one who conducts such activities on another's land as, for instance, a blasting operation in the course of railroad construction.[20] If the defendant in this case were the East Ohio Company, the application of the doctrine to East Ohio's storage of "liquefied gas" would be the major problem in the case. But this is not a suit against the East Ohio Company; it is a suit against the people who supplied the material and built the storage tank which gave way. Contrary to appellant's argument, they are not in the situation of one who creates a nuisance like the building of a dam which floods another's land or a structure which encroaches upon a neighboring property. The defendants built a tank for East Ohio and were paid for it. They did not operate a gas liquefaction and storage enterprise. It is true, for East Ohio's benefit, they supervised the first filling of the tank. But the tank had been filled five times since the defendants had supervised the first filling.

It is true that East Ohio called upon the defendants for advice and service from time to time. The Vice President of East Ohio testified: "I don't think we ever made any changes or did any work there that we did not consult them * * * but we had a close relationship with Pittsburgh-Des Moines, and we considered that they were our protectors until we got things in a good, safe way." Nevertheless, everything which the defendants did after the tank was erected and turned over to East Ohio was at East Ohio's request. "Control is the criterion of responsibility for control means that power which occasions and which can prevent." Shindelbeck v. Moon, 1877, 32 Ohio St. 264, 30 Am.Rep. 584. This enterprise was under the control of East Ohio, not the defendants. It is East Ohio, and not the defendants, for whom the question of liability for consequences of an ultrahazardous enterprise could become an arguable question. Defendants cannot be held liable under the plaintiff's first theory.

### Liability for Negligence

■ The second theory of responsibility which the plaintiff urges against the defendants is that the defendants were negligent in the plans for the structure and materials used therein. Before we outline the plaintiff's allegations with regard to negligence there is a legal question to be met. Assume, for the moment, that the plaintiff has alleged and shown negligence on the part of the defendants in planning and erecting the structure. Does their responsibility extend to harm suffered by one in the position of the plaintiff after the structure has been turned over to the purchaser, East Ohio? This is a question of tort law and a Pennsylvania court, as already stated, in the application of well established rules of conflict of laws, would look to the Ohio law to determine it.[21] We do the same.

The old rule was that the manufacturer of a chattel was not responsible for injuries to others than his immediate vendee.[22] Exceptions grew up to the rule[23] and the whole matter received clarifica-

Church, 1933, 126 Ohio St. 140, 184 N.E. 512 (explosion of natural gas); Huff v. Austin, 1889, 46 Ohio St. 386, 21 N.E. 864, 15 Am.St.Rep. 613, (a steam boiler).

[20] Green v. T. A. Shoemaker & Co., 1909, 111 Md. 69, 73 A. 688, 23 L.R.A.,N. S., 667; Munro v. Pacific Coast Dredging & Reclamation Co., 1890, 84 Cal. 515, 24 P. 303, 18 Am.St.Rep. 248.

[21] Supra fn. 3.

[22] Winterbottom v. Wright, 10 Mes. & Wel. 109 (Ex.1842).

[23] One of the early exceptions was in those cases in which the dealer erroneously labeled a bottle of poison. Thomas v. Winchester, 1852, 6 N.Y. 397, 57 Am.Dec. 455. The results of the American authorities were best summed up by Sanborn, J. in Huset v. J. I. Case Threshing Mach. Co., 8 Cir., 1903, 120 F. 865, 61 L.R.A. 303, in which he stated that a manufacturer was liable for harm to a third person caused by an article put on the market in such form that it is imminently dangerous to life or health and is intended to preserve, destroy or affect human life or where there is "privity" between the parties or finally where the defendant actually knew of the defect.

tion by the New York Court of Appeals, through Judge Cardozo, in what is now the leading case of MacPherson v. Buick Motor Co.[24] This decision puts responsibility for an injury to one operating the car on one who negligently manufactures a part of an automobile and it is fair to call the decision a landmark in tort law. An examination of the Ohio authorities shows clearly, we think, that the principles upon which MacPherson v. Buick Motor Co. was decided are part of the law of Ohio.[25] They are, likewise, generally, though not universally, accepted in modern law and are adopted in the Restatement of Torts.[26]

A finding of the acceptance by the Ohio courts of the principle of MacPherson v. Buick Motor Co. does not give the full answer to the question involved here. We need to find that those courts have taken, or would take, one step more and possibly two. The first step is the manufacturer's or supplier's responsibility, not merely to the ultimate consumer of the article, but to a person in the vicinity of its use who is injured by the manufacturer's lack of due care. This extension of the MacPherson v. Buick Motor Co. doctrine is indicated in the Restatement[27] and is clearly indicated to be the Ohio law in the decision of White Sewing Machine Co. v. Feisel.[28] In this case the Court of Appeals held the manufacturer of an electric cord was liable for injuries sustained by the child of the vendee. The principle was discussed and followed in Gilbride v. Leffel & Co.[29] We have no difficulty, therefore, in finding that the Ohio law imposes liability on a manu-

See Prosser, Law of Torts (1941) p. 675.

[24] 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440.

[25] "An examination of the cases cited will disclose that, while the rule was originally applied where the article of sale was 'inherently' or 'imminently' dangerous, it is now commonly invoked in cases where the dangerous character of the thing is made imminent by defective construction, which is the result of negligence, or would be discoverable upon exercise of ordinary care in making a reasonable inspection.

"The rule applicable to the instant case, and sustained by both the current and weight of authority, is stated by Cardozo, J., in the case of MacPherson v. Buick Motor Car Co., supra." White Sewing Mach. Co. v. Feisel, 1927, 28 Ohio App. 152, 156, 162 N.E. 633, 634; see also Dow Drug Co. v. Nieman, 1936, 57 Ohio App. 190, 13 N.E.2d 130.

[26] § 394 (1934); see Seavey, Mr. Justice Cardozo and the Law of Torts, 52 Harv.L.Rev. 372, 376-381 (1939); cf. Roettig v. Westinghouse Electric & Mfg. Co., D.C.E.D.Mo.1944, 53 F.Supp. 588; McLeod v. Linde Air Products Co., 1927, 318 Mo. 397, 1 S.W.2d 122.

[27] "§ 395. Negligent Manufacture of Chattel: Dangerous Unless Carefully Made.

"A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured."

* * * * * *

"Illustration:
"1. The A Motor Company incorporates in its car wheels manufactured by the B Wheel Company. These wheels are constructed of defective material, as an inspection made by the A Company before putting them on its car would have disclosed. The defective character of the wheel, however, is not readily discoverable after the wheel has been installed. The car is sold to C through the D Company, an independent distributor. While C is driving the car the defective wheel collapses causing the car to swerve and collide with that of E, causing harm to C, E, F and G, who are guests in the cars of C and E respectively. The A Motor Company is liable to C, E, F and G." Restatement, Torts (1934) § 395. This same liability to third persons who may be in the vicinity of the probable use of the product has been placed on independent contractors who negligently make, rebuild or repair a chattel for another. See Restatement, Torts (1934) § 404.

[28] 1927, 28 Ohio App. 152, 162 N.E. 633; cf. McLeod v. Linde Air Products Co., 1927, 318 Mo. 397, 1 S.W.2d 122.

[29] Ohio App. 2d District 1942, 47 N.E. 2d 1015.

facturer, not alone to the ultimate consumer, but to one who might reasonably have been expected to be in the vicinity of the chattel's use.

■ The last step may or may not be one which must be taken. If these tanks when constructed technically remain "chattels" we think that the rules heretofore set out cover the situation. If, however, the tanks, and especially tank No. 4, be affixed to the realty in such a way as technically to become part of the land, then we have the question of applying the principle of MacPherson v. Buick Motor Co. to structures. This extension has been accepted in full by the Restatement of Torts, § 385[30] and, we think, represents the trend of modern authority.[31] We have not found any Ohio case which presented this question on its facts unless Gilbride v. Leffel & Co., supra, is such a one.[32] In that case the article alleged to have been defective was a boiler and we do not know from reading the decision whether the boiler was affixed to the realty or not. It might have been and it probably was, but it is not so expressly stated. The Ohio decisions cited and discussed in this opinion cite, quote, and follow fully the analysis of the problem of liability as it is set out in the Restatement of Torts. We have no doubt that an Ohio court confronted with the question would, in accordance with the development of the law shown in its previous decisions, extend the liability of the manufacturer to negligence involved in building a structure even though that structure was affixed on another's land.

■ We pass then to the question whether the plaintiff presented evidence of defendants' negligence which, if accepted by the trier of fact, would entitle him to recover. The plaintiff listed fourteen separate specifications of negligence on the part of the defendants in their activity in designing, furnishing materials, erecting and subsequently servicing the No. 4 storage tank. If we, ourselves, were making the classification we would combine some of them as, indeed, the plaintiff did in presenting the case to us. We at first thought some of them could be disregarded, but subsequent examination of the testimony shows there is some basis for each one. The relative weight to be given to each is, of course, for the trier of fact, not for us.

It would be unprofitable to discuss these specifications in detail. It is sufficient, we think, to list them in the margin,[33] together with our comment that we think that the

---

30 "§ 385. Persons Creating Artificial Conditions on Land on Behalf of the Possessor; Bodily Harm Caused Thereby After the Work Has Been Accepted.

"One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others within or without the land for bodily harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor under the same rules as those stated in §§ 394 to 398, 403 and 404 as determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others."

31 See Murphy v. Barlow Realty Co., 1939, 206 Minn. 527, 289 N.W. 563; Note 1939, 123 A.L.R. 1201 et seq.

32 In McDonald v. Haughton Elevator & Mach. Co., 1938, 60 Ohio App. 185, 20 N.E.2d 253, 256, the court quoted with approval the proposition that duties of an independent contractor who had agreed to keep elevators in repair "must be measured by rules applicable to manufacturers and sellers."

33 The list follows:

"1. The Use of a dangerous Cylindrical form for Tank No. 4, instead of the relatively safer Spherical form.

"2. A Defective and Dangerous Design of the Safety Valve Assembly (the so-called Christmas Tree) at the top of Tank No. 4.

"3. A Defective Design of the bottom of Tank No. 4 which failed to provide adequate ventilation for the bottom.

"4. A Defective Design of the lower part of Tank No. 4 in permitting the stresses to be dangerously high and without adequate factor of safety.

"5. A Defective Design in failing to provide any means for keeping the liquid contents of No. 4 sufficiently stirred or mixed to avoid the hazard of dangerous 'bumping,' or superheating of the liquid contents, and the shock thereby induced.

"6. The use of Rock Wool as insulating material.

"7. The failure to use Cork as the insulating material.

"8. The use of a dangerously brittle material (3½% Nickel Steel) for the

evidence to support them shows enough, at this stage of the litigation, to require their submission to a jury to pass upon the question whether that body would believe the evidence and draw the inference of negligence therefrom.

## Proximate Cause

■ The defendants in argument on this appeal have devoted little attention to the specifications just described. In fact, at the oral argument the defendants were willing to assume that some of these specifications showed that there was a violation of the standard of care. But defendants' argument is that there must be causal connection between the defendants' alleged wrong and the plaintiff's alleged harm and it is part of the plaintiff's task to prove that causal connection. That is a correct proposition of law.[34] We disagree, however, with its application for we do not agree that it was correct to nonsuit the plaintiff on this point.

■ So far as proximate cause is determined by rules of law, the law to which reference is made will be the law of the place of wrong, here Ohio. That is the orthodox conflict of laws rule[35] and we have no doubt that a Pennsylvania court would make the reference.[36] The accepted rule about proximate cause and the rule recognized in Ohio is that the plaintiff does not have to show the defendants' liability creating act was the sole cause of the injury.[37] It is enough if it is found, by the trier of fact, to be a substantial factor in producing the resultant injury.[38] The testimony of experts who made an investigation of this accident in Cleveland to the effect that they did not agree upon one precise or sole cause for the catastrophe does not settle the question of legal responsibility in tort one way or the other.

■ The ordinary rule is that the sufficiency of evidence is to be determined by the law of the forum and Pennsylvania cases so hold. Sudol v. Gorga, 1943, 346 Pa. 463, 31 A.2d 119; Carroll v. Godding, 1944, 155 Pa.Super. 490, 38 A.2d 720. Thus while Ohio rules with regard to causation are to be looked to, we have no doubt, also, that the method of proving causal connection as well as negligent acts must be done in the Pennsylvania fashion.[39] In this sort of instance we have previously said that we think the federal court in a diversity case should follow the state's rule as to this matter. In Waldron v. Ætna Casualty & Surety Co., 3 Cir., 1944, 141 F.2d 230, we said: "While questions of evidence ordinarily relate to matter of procedure, the sufficiency of the evidence goes to the maintenance of the substantive right and is, therefore, to be tested by local law in cases where such law controls." Page 234 of

construction of the Inner shell of Tank No. 4.

"9. The failure to make any tests whatever of the impact strength, or brittleness, of the Nickel Steel used for the inner shell of No. 4 tank.

"10. The failure to make separate tests of each of the seven heats of steel which were used in fabricating the inner shell of No. 4 tank.

"11. The use of two particular heats of steel in the fabrication of the inner shell of No. 4 tank which were so brittle as to be utterly unfit for use.

"12. Inadequate standards or requirements with respect to the Welding of Tank No. 4.

"13. Improper Workmanship in the Welding of Tank No. 4.

"14. The failure to heed obvious warning signs of danger."

[34] See Restatement, Torts (1934) §§ 281(c), 430.

[35] Restatement, Conflict of Laws (1934) § 383.

[36] Di Giosia v. H. S. Kerbaugh, Inc., 1916, 252 Pa. 535, 97 A. 698; Levinson v. McCoury, 1932, 104 Pa.Super. 135, 159 A. 55.

[37] Mansfield R., Light & Gas Co. v. Kiner, 1913, 2 Ohio App. 82, 17 Ohio Cir.Ct.R.,N.S., 431; Smith v. Seiler, 1933, 40 O.L.R. 148.

[38] Szabo v. Tabor Ice Cream Co., 1930, 37 Ohio App. 42, 174 N.E. 18; cf. Corey v. Havener, 1902, 182 Mass. 250, 65 N.E. 69; Oulighan v. Butler, 1905, 189 Mass. 287, 75 N.E. 726; Bankers Indemnity Ins. Co. v. Cleveland Hardware & Forging Co., 1945, 77 Ohio App. 121, 62 N.E. 2d 180.

[39] "What is meant by saying that the law of the place of wrong determines the question of legal causation is that it sets the standard for determining it. The application of the standard to the facts must, of course, be made by the trier of facts at the forum in accordance with its procedural rules." Restatement, Conflict of Laws (1934) § 383, Comment b.

141 F.2d; see, also, Stoner v. New York Life Insurance Co., 1940, 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284; see Morgan, Choice of Law Governing Proof, 58 Harv. L.Rev. 153, 171-177 (1944).

 In this connection we meet the Pennsylvania rule about "individuating" causes of injury[40] and, as said above, plaintiff's case must conform to it even though the litigation is in a federal court. But we think that plaintiff's case did conform to it here.

It is true that J. O. Jackson, an employee of defendants, called for cross-examination by the plaintiff, gave several theories concerning what might have caused the accident. But the facts on which these theories were based were negatived by testimony from other witnesses for the plaintiff. The plaintiff's testimony showed the various alleged negligent acts of material furnishing, construction, and maintenance. Some of the testimony identified the spot in the inner tank of this structure where, in one witness's expert opinion, the first rupture occurred. This was close to at least two of the defects listed by the plaintiff in items of negligence and upon which testimony had been offered. Eye witness testimony, if believed, showed that the series of events culminating in the catastrophe began with the escape of vapor in large and then larger quantities, followed by fire. In other words, the plaintiff's testimony, if accepted, not only showed defects in the structure, but showed how the structure gave way and how the destructive force, that is this rapidly vaporizing liquid rolled out from

---

[40] It is difficult to get a clear harmonized pattern out of the numerous Pennsylvania cases on this point. In fact if one could select his cases and ignore those unfavorable to him he could find authority which has not been expressly overruled, to support any one of the following positions:

1. Besides showing a causal connection between the alleged negligence and the resultant harm, plaintiff must explain away by a preponderance of evidence any theory on how the accident arose advanced by the defendant. See, e.g., Sandt v. North Wales Foundry Co., 1906, 214 Pa. 215, 63 A. 596.

2. Besides showing a causal connection between the alleged negligence and the resultant harm, plaintiff must explain away by proof the evidence of the defendant that the accident occurred in a manner for which he would not be liable. See, e.g., Giordano v. Clement Martin, Inc., 1943, 347 Pa. 61, 31 A.2d 504; Rozumailski v. Philadelphia Coca-Cola Bottling Co., 1929, 296 Pa. 114, 145 A. 700.

3. The expression is simply a complicated method of stating that although one can infer negligence from the circumstances from which the accident arose one cannot presume negligence from the mere fact that an accident happened. See, e.g., Hitchman v. H. S. Kerbaugh, Inc., 1914, 242 Pa. 582, 89 A. 669; Spees v. Boggs, 1901, 198 Pa. 112, 47 A. 875, 52 L.R.A. 933, 82 Am.St.Rep. 792; Mixter v. Imperial Coal Co., 1893, 152 Pa. 395, 27 A. 587; Philadelphia and Reading R. R. v. Schertle, 1881, 97 Pa. 450; see Giordano v. Clement Martin, Inc., 1943, 347 Pa. 61, 63, 31 A.2d 504, 505.

4. To prevail, plaintiff must produce evidence which supports his allegations of negligence and also show by evidence which if believed, together with permissible inferences, that the accident which occurred resulted from the negligence alleged. See, e.g., Liguori v. Philadelphia, 1945, 351 Pa. 494, 41 A.2d 563; Lott v. Peoples Natural Gas Co., 1936, 324 Pa. 517, 188 A. 582; King v. Equitable Gas Co., 1932, 307 Pa. 287, 161 A. 65.

An examination of the testimony in this case convinces us that a Pennsylvania court, using any of the propositions set out above, would permit the case to go to a jury. Plaintiff has put in evidence which shows the causal connection and the defendants' theories are not supported by any evidence and are contradicted by positive evidence. Cf. Giordano v. Clement Martin, Inc., 1943, 347 Pa. 61, 31 A.2d 504. We think, moreover, that the later Pennsylvania cases have approached the position advanced in proposition number four and would only require that the plaintiff's evidence, if believed, would support her theory for "since proof to a degree of absolute certainty is rarely attainable in any litigated factual controversy, the law requires only that the evidence as to the operative cause of the accident be enough to satisfy reasonable and well-balanced minds that it was the one on which the plaintiff relies." Liguori v. Philadelphia, 1945, 351 Pa. 494, 498, 41 A.2d 563, 565 (issue was whether boy struck his head on the bottom of swimming pool or on a pipe therein); Mars v. Philadelphia Rapid Transit Co., 1931, 303 Pa. 80, 154 A. 290.

its place of storage and created the havoc which everyone admits was created. We conclude, therefore, that plaintiff's case was not defective under the Pennsylvania requirement of individuated causes and the plaintiff was entitled to go to the jury with it.

## Assumption of Risk

■ Defendants argue that the doctrine of assumption of risk applied to the decedent and prevents recovery by his representative here. Its argument is more appropriately directed to the attempt to base liability on ultrahazardous occupation theory. We think it applicable neither there nor to the negligence theory. To assume a risk one must know what he is assuming.[41] Here, the plaintiff's decedent did not work in the liquefying and storage plant; there is nothing in the record to indicate that he knew the risks involved therein and certainly nothing to show that he had any knowledge of the risks from negligent materials in construction, if such existed. We think the assumption of risk suggestion may be disposed of peremptorily by saying it is not applicable.

## Testimony of Adverse Witness

Amici have presented the question of whether plaintiff is bound by the testimony of an adverse witness called for examination under the statute.[42] Defendants did not press this question and we mention it only in the event that it might be raised in a subsequent trial. It only comes up in connection with the testimony of J. O. Jackson, one of the employees of defendants. This witness gave certain testimony as to possible causes for the accident. We have already noted above that the assumption on which these suggested conclusions

were based were flatly denied by other witnesses. We do not think that there is involved, at this stage at least, any serious question which requires us, at this point, to thread our way through the Pennsylvania decisions under the statute.

## Corporation and Partnership Responsibility

■ Defendants make the point that in no event is the Corporation liable for the consequences sought to be imposed upon it here. The defendants, it will be remembered, are the Partnership which is called "Pittsburgh-Des Moines Steel Company", J. E. Jackson, one of the partners, and, finally, Pittsburgh-Des Moines Company, the Corporation. Plaintiff's point here is that the activities of the parties and their part in the construction of Tank No. 4 were inextricably intertwined. There is evidence to support this theory. Only one or two pieces of it need to be outlined. Corporation owns a plant at Neville Island, Pennsylvania. The sign on top of its building carries the Partnership name. A facsimile of Mr. J. O. Jackson's signature was printed on a form which was used interchangeably as a purchase order by both Corporation and Partnership. Letters signed by the Corporation were sent on the Partnership letterhead; letters to the Corporation were answered by the Partnership. We think there was enough in the testimony to present to the trier of fact the question whether both Partnership and Corporation were not involved in the contract and the construction of the storage tank, the rupture of which caused the disaster.

The judgment of the District Court will be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

---

[41] Restatement, Torts (1939) § 893 (negligent conduct on the part of the defendant); Restatement, Torts (1938) § 523 (defendant engaged in ultrahazardous activities).

[42] 28 P.S. § 381 (1930).