[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1027 
W. Bruce Leithead III appeals from an order entered by the Shelby Circuit Court dismissing his complaint on the basis that the court lacked jurisdiction over Banyan Corporation ("Banyan"). We reverse and remand.
 I. Facts and Procedural History
Leithead is an Alabama resident. Banyan was formed in 1978 as an Oregon corporation with its principal place of business in California. In 1995 Banyan acquired DoubleCase Corporation ("DoubleCase"), a Kansas corporation with its principal place of business in Colorado, as a wholly owned subsidiary. In May 2001 Banyan acquired Chiropractic USA, Inc. ("Chiropractic"), a Colorado corporation with its principal place of business in Louisiana, also as a wholly owned subsidiary.
In the summer of 2001, Leithead, anticipating being named president of DoubleCase, sought and received Banyan's permission to relocate DoubleCase's principal place of business from Colorado to Alabama. On November 1, 2001, Leithead purportedly entered into a written employment contract with DoubleCase; the contract referred to Leithead as president of DoubleCase. The contract provided, among other things, that Leithead's compensation package would include 400,000 shares of Banyan's common stock, as well as options to purchase an additional 400,000 shares of Banyan's common stock. In the event DoubleCase terminated Leithead's employment before December 31, 2003, Leithead would immediately be entitled to the 400,000 shares promised as compensation and would have 60 days in which to exercise all stock options. Three entities are listed as parties to the contract: DoubleCase, Leithead, and Banyan. There is a signature line for Banyan as the "parent" company, under which is typed the name "Michael Gelmon, C.E.O."; this line is signed by Michael Gelmon. The signature line provided for execution by DoubleCase proposed that it would be signed by "Michael Gelmon, Director." That entry is marked through with a large "X," followed by the cursive initials "MG." Michael Gelmon subsequently stated in an affidavit that he had marked through the DoubleCase signature line because it incorrectly listed him as a director of DoubleCase, which he asserted he was not and has never been. Whatever Gelmon's relationship with DoubleCase, no other person signed the contract on behalf of DoubleCase.
According to Leithead, Banyan exercised significant control over DoubleCase. He makes repeated reference to the Gelmon brothers, Michael and Cory, who held a controlling interest in Banyan. Leithead's affidavit filed in opposition to Banyan's motion for a dismissal on the ground of lack of jurisdiction states, in pertinent part:
 "6. . . . Banyan, through the Gelmons, made all significant decisions for and controlled [DoubleCase]. Although I primarily ran the day-to-day operations of [DoubleCase's] business, Banyan's representatives made the significant decisions, including the move to the State of Alabama, my compensation package, and they had to approve [DoubleCase's] entire business plan, which they did. I was required to provide regular reports to Banyan's representatives on [DoubleCase's] business and *Page 1028 
maintained a constant dialogue with them regarding [DoubleCase's] activities, accounts, money coming in, and the like. On the average, I would say that I communicated with Banyan and the Gelmons four (4) times per week in this regard during the time period that [DoubleCase] maintained the office in Alabama. We generally communicated by telephone, or by e-mail at times.
". . . .
 "8. On or about November 1, 2001, I signed an employment contract with [DoubleCase]/Banyan. . . . Michael Gelmon sent the employment contract to me in the State of Alabama, and I signed the contract in the State of Alabama. . . .
 "9. Banyan sent me 400,000 shares of Banyan stock in Alabama in or about November 2001. . . .
". . . .
 "17. Mr. Gelmon's affidavit states that Banyan does not transact business or enter into contracts in the State of Alabama. Banyan was clearly a party to the employment contract with me. . . . In addition, I know that Banyan previously entered into an agreement with Cary Neil in 2002 for Cary to keep Banyan's financial books. Cary lived and worked in Birmingham, Alabama at that time, and Cary worked on the books for Banyan while in Alabama. I believe that Banyan sent payments to Cary in Alabama during this time period.
 "18. . . . Attached . . . is a true and correct copy of the annual report for the year ending December 31, 2001 submitted by the Gelmons, on behalf of Banyan, to the Securities and Exchange Commission (`SEC') that I obtained. In this document, Banyan and the Gelmons represented to the SEC on page 15 that Banyan had a `management agreement' in place with me. And, on page 38, it is represented that Banyan `entered into a two-year employment agreement' with me in November 2001. These statements further demonstrate that Banyan was a party to my employment contract."
As Leithead states in the final paragraph quoted above, Banyan's annual report submitted to the Securities and Exchange Commission, which is included in the record, on page 15 states that "[Banyan] currently has management agreements in place with Cory Gelmon, Michael Gelmon, and [Leithead], the president of DoubleCase." Additionally, as Leithead alleges, page 38 of the same report indeed states that "[i]n November 2001, [Banyan] entered into a two-year employment agreement . . . expiring on December 31, 2003, with the president of DoubleCase."
Over time, DoubleCase's financial health deteriorated, resulting in the virtual collapse of the corporation, at which time Banyan sold DoubleCase to another company. This sale and Leithead's consequent termination as president of DoubleCase occurred on October 30, 2002.
Before the sale of DoubleCase, the Gelmons had invited Leithead to meet with them in Canada. Leithead alleges that at that meeting they offered him employment as an area developer for Chiropractic. Leithead returned to Alabama, and during the next two or three months, as DoubleCase was sold, he communicated by telephone at least 12 times with representatives of Banyan, about half of those telephone conversations being with one or both of the Gelmons. Leithead even met with the Gelmons in Louisiana in November 2002. According to both Leithead's complaint and his affidavit, in telephone conversations during that time, Banyan representatives told Leithead to refrain from exercising the stock options he became *Page 1029 
entitled to exercise as of the date of his termination as president of DoubleCase — and which would expire 60 days from that date — explaining that those stock options would "roll over" into Leithead's new position with Chiropractic. Leithead complied with these instructions and refrained from exercising his stock options.
On December 29, 2002, Leithead's stock options expired. Some time between November 2002 and April 2003, Banyan made the corporate decision to retain only chiropractors as area developers of Chiropractic; Leithead is not a chiropractor. In April 2003, Michael Gelmon telephoned Leithead and left him a voice mail, informing him of Banyan's decision to use only chiropractors as area developers.
On January 9, 2004, Leithead filed the underlying action in the Mobile Circuit Court against Banyan, Chiropractic, and DoubleCase. His complaint alleged that Banyan, Chiropractic, and DoubleCase were liable for breach of contract and negligence. On March 11, 2004, Banyan and Chiropractic filed a motion to dismiss pursuant to Rule 12(b)(2), Ala. R. Civ. P., arguing that the trial court lacked personal jurisdiction over them.[1]
Pursuant to an agreement of the parties, the court subsequently transferred the underlying action to the Shelby Circuit Court. That court heard oral argument, apparently not reported and transcribed, after which it granted the motions to dismiss filed by Banyan and Chiropractic. The trial court certified, pursuant to Rule 54(b), Ala. R. Civ. P., that there was no just reason for delay and that its order as to each motion to dismiss constituted a final judgment. Leithead timely appealed the judgment as to Banyan only.
 II. Standard of Review
"`"An appellate court considers de novo a trial court's judgment on a motion to dismiss for lack of personal jurisdiction."'" Corporate Waste Alternatives, Inc. v. McLaneCumberland, Inc., 896 So.2d 410, 413 (Ala. 2004) (quotingWenger Tree Serv. v. Royal Truck Equip., Inc., 853 So.2d 888,894 (Ala. 2002), quoting in turn Elliott v. Van Kleef,830 So.2d 726, 729 (Ala. 2002)). Further:
 "In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiff's complaint not controverted by the defendant's affidavits. Robinson v. Giarmarco Bill, P.C., 74 F.3d 253 (11th Cir. 1996), and Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829 (11th Cir. 1990), and `where the plaintiff's complaint and the defendant's affidavits conflict, the . . . court must construe all reasonable inferences in favor of the plaintiff.' Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990)). `For purposes of this appeal [on the issue of in personam jurisdiction] the facts as alleged by the . . . plaintiff will be considered in a light most favorable to him [or her].' Duke v. Young, 496 So.2d 37, 38 (Ala. 1986)."
Ex parte McInnis, 820 So.2d 795, 798 (Ala. 2001).
 III. Analysis
A state has jurisdiction over a person or corporation so long as its "longarm statute" reaches the person or corporation *Page 1030 
and the state's jurisdiction comports with the requirements of due process. This Court has held that Alabama's longarm "statute," which is actually Rule 4.2, Ala. R. Civ. P., extends to the limits of due process.[2] Ex parte McInnis,820 So.2d at 802; Duke v. Young, 496 So.2d 37, 39 (Ala. 1986). At the time relevant to this action, Rule 4.2(a)(1)(B) provided that an "[a]ppropriate basis exists for service of process outside of this state upon a person in any action in this state when . . . the person has sufficient contacts with this state, as set forth in subdivision (a)(2) of this rule. . . ." Subdivision (a)(2), in turn, set forth eight categories of action that established the necessary "sufficient contacts" if a person engaged in any one of them. In the event that none of the specific actions listed brought the defendant within the State's jurisdiction, subdivision (a)(2)(I) provided that the State could assert jurisdiction over the person if he otherwise had "some minimum contacts with this state and, under the circumstances, it is reasonable to require the person to come to this state to defend an action." This "catchall" provision authorized asserting jurisdiction to the extent permitted by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[3]
"`"The plaintiff bears the burden of proving the court's personal jurisdiction over the defendant."'" Ex parte CovingtonPike Dodge, Inc., 904 So.2d 226, 229 (Ala. 2004) (quoting Exparte Dill, Dill, Carr, Stonbraker Hutchings, P.C.,866 So.2d 519, 525 (Ala. 2003), quoting in turn Daynard v. Ness, Motley,Loadholt, Richardson Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002)). On appeal, Leithead offers this Court numerous alternative approaches by which he argues we should find that Alabama has jurisdiction over Banyan. Because we find that the trial court had in personam jurisdiction over Banyan through the catchall provision of Rule 4.2(a)(2)(I), we pretermit discussion of Leithead's other jurisdictional theories.
 "`A physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident.' Sieber v. Campbell, 810 So.2d 641, 644 (Ala. 2001). What is required, however, is that the defendant have such contacts with Alabama that it `"should reasonably anticipate being haled into court [here]."' Dillon Equities v. Palmer Cay, Inc., 501 So.2d 459, 462 (Ala. 1986) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).
 "Depending on the quality and quantity of the contacts, jurisdiction may be either general or specific. Leventhal v. Harrelson, 723 So.2d 566, 569 (Ala. 1998). `General jurisdiction applies where a defendant's activities in the forum state are "substantial" or "continuous and systematic," regardless of whether those activities gave rise to the lawsuit. . . .
 "But regardless of whether jurisdiction is alleged to be general or specific, the nexus between the defendant and the forum state must arise out of `"an *Page 1031 action of the defendant [that was] purposefully directed toward the forum State."' Elliott [v. Van Kleef, 830 So.2d 726, 731 (Ala. 2002)] (quoting Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). `This purposeful-availment requirement assures that a defendant will not be haled into a jurisdiction as a result of "`the unilateral activity of another person or a third person.'"' Elliott, 830 So.2d at 731 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985))."
Ex parte Dill, Dill, Carr, Stonbraker Hutchings, P.C.,866 So.2d at 525-26. We conclude that Banyan is subject to the jurisdiction of Alabama's courts because of its general contacts with Alabama.
As noted, for general jurisdiction to apply the out-of-state defendant's contacts with Alabama must be "substantial" or "continuous and systematic." Ex parte Dill, Dill, supra. Contacts may constitute general contacts "regardless of whether those activities gave rise to the lawsuit." HelicopterosNacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414,104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
Looking to the record before us, we consider Banyan to have had the following contacts with Alabama: representatives of Banyan, including the Gelmons, placed an estimated 270 telephone calls to Leithead in Alabama. Banyan signed and subsequently mailed an employment contract to Leithead in Alabama, as well as certificates evidencing Leithead's acquisition of shares of Banyan stock. Banyan had a "management agreement" with Leithead, so that Leithead's activities in Alabama constituted, at least in part, a business presence by Banyan in this State. Finally, Leithead alleges (and under our standard of review we must accept as true) that Banyan employed Cary Neil, an Alabama resident, as one of its bookkeepers during the time period in question.
With respect to the employment of Cary Neil, we initially note that Banyan has not denied any of Leithead's allegations, beyond the general statement in Michael Gelmon's affidavit that Banyan has no agents in Alabama. We thus consider Neil to have been an employee of Banyan who worked within Alabama; employing an Alabama resident to work within the State clearly constitutes a general contact with Alabama.
We now turn to Banyan's telephone calls to and its mailing of a contract and stock certificates to Leithead. In SteelProcessors, Inc. v. Sue's Pumps, Inc. Rentals, 622 So.2d 910,913 (Ala. 1993), this Court stated that "`[t]he use of interstate facilities (telephone, the mail) . . . [is a] secondary or ancillary factor and cannot alone provide the "minimum contacts" required by due process.'" 622 So.2d at 913 (quotingScullin Steel Co. v. National Ry. Utilization Corp.,676 F.2d 309, 314 (8th Cir. 1982)). This Court's emphasis in SteelProcessors on the inability of telephone calls or mailed documents "alone" to provide minimum contacts indicates that, in conjunction with other contacts, telephone calls and mail can constitute contacts that can be considered to determine whether a party has subjected itself to general jurisdiction of the courts of this State. Further support for this notion is found inInvestors Guaranty Fund, Ltd. v. Compass Bank, 779 So.2d 185
(Ala. 2000), in which we found that the trial court had jurisdiction based on numerous contacts between the out-of-state defendant and Alabama; in discussing those contacts we referenced "repeated telephone and written communication" as "further" evidence of those contacts. 779 So.2d at 190. *Page 1032 
Considering the presence of a Banyan employee in Alabama during the time in question, as well as the presence of Leithead in his capacity under the employment agreement to which Banyan was a party, plus nearly 300 telephone calls made by Banyan to Leithead in Alabama during that same time frame, we believe that Banyan's contacts with Alabama were both "substantial" and "continuous and systematic." Consequently, we conclude that it was foreseeable to Banyan that it could be haled into an Alabama court and subjected to its jurisdiction.
Further, Banyan's contacts with Alabama did not arise through the unilateral activity of Leithead or Neil. Although Leithead indisputably relocated DoubleCase to Alabama, he did so after seeking and receiving Banyan's permission. This evidences bilateral, not unilateral, conduct. In addition, although we have no evidence indicating Cary Neil's exact connection to Alabama, other than his residency, the facts, viewed in the light most favorable to Leithead, demonstrate that Neil did not unilaterally create Banyan's contact with Alabama. Finally, there is no suggestion whatever that only Leithead telephoned Banyan, and Banyan expressly states that it mailed an employment contract to Leithead in Alabama for execution. In short, Banyan purposefully availed itself of the privilege of doing business in Alabama.
The final analysis in which we must engage is whether subjecting Banyan to Alabama's jurisdiction would violate traditional notions of "fair play and substantial justice."International Shoe v. Washington, 326 U.S. 310, 320,66 S.Ct. 154, 90 L.Ed. 95 (1945). This Court, in an appropriate case, may evaluate (1) the burden on Banyan of litigating in Alabama, (2) Alabama's "interest in adjudicating the dispute," (3) Leithead's "interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) the "shared interest of the several States in furthering fundamental substantive social policies." World-Wide Volkswagen Corp. v.Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490
(1980).
With respect to these factors, we find as follows. Defending this action in Alabama, when Banyan's activities extend to locales such as California, Louisiana, and Canada, in addition to Alabama, would not seem to impose a significant financial burden upon Banyan. Second, as we have explained, Alabama will always have an interest in "providing an effective means of recovery for a resident who has been damaged." Shrout v. Thorsen,470 So.2d 1222, 1225 (Ala. 1985). Third, Leithead obviously has an interest in securing relief without having to resort to the expense of traveling to a jurisdiction such as California for a trial. Finally, neither party offers any reason that this Court should consider the interests of the interstate judicial system or the substantive social policies of the possible jurisdictions that are involved in the events underlying this action.
Therefore, after appropriately weighing these factors, we conclude that subjecting Banyan to Alabama's jurisdiction would not violate "traditional notions of fair play and substantial justice" and that Banyan has not otherwise shown that the exercise of jurisdiction by this State over this action would be unreasonable. Consequently, we hold that Banyan is subject to the general jurisdiction of the Shelby Circuit Court.
 Conclusion
Because Banyan is subject to the general jurisdiction of the Shelby Circuit Court, the trial court erred in granting its motion to dismiss. The trial court's judgment is accordingly reversed and the cause is remanded *Page 1033 
for proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, STUART, and BOLIN, JJ., concur.
[1] DoubleCase did not join in this motion. Leithead later sought a default judgment against DoubleCase, and although the record contains no indication that a judgment has been entered, there was an entry on the case action summary sheet declaring the motion for a default judgment had been "granted" with leave to prove damages.
[2] Both the underlying conduct and the filing of this action occurred before August 1, 2004, when an amendment significantly revising Rule 4.2, Ala. R. Civ. P., became effective. Thus, Rule 4.2 as it existed before the August 1 amendment is to be applied in the instant action.
[3] The amendment to Rule 4.2, Ala. R. Civ. P., effective August 1, 2004, deleted the "laundry list" of types of conduct that would subject an out-of-state defendant to personal jurisdiction in Alabama, "[b]ecause the `catchall' clause has consistently been interpreted to go to the full extent of federal due process." Committee Comments to Amendment of Rule 4.2 Effective August 1, 2004.