Hospital Espanol de Auxilio Mutuo de Puerto Rico, Inc. ("Auxilio Mutuo"), petitions this Court for a writ of mandamus directing the trial court to vacate its order denying its motion to dismiss Lisa M. Holsomback and Bobby Holsomback's claims against it for lack of personal jurisdiction and to enter an order dismissing the Holsombacks' complaint insofar as it asserts claims against Auxilio Mutuo. We grant the petition.
 Facts
On August 1, 2003, Lisa M. Holsomback and her husband, Bobby, sued LifeLink Foundation, Inc., Alabama Organ Center, and others, alleging that a kidney she had received by transplant at University of Alabama at Birmingham Hospital was infected with hepatitis C. By amendment, the Holsombacks substituted Auxilio Mutuo for the fictitiously named defendant who was identified in the complaint as the entity "responsible for the testing and suitability of the donor kidney." The Holsombacks allege that Auxilio Mutuo negligently or wantonly caused or allowed "inadequate, improper, and erroneous testing to be performed on the serology tests for the donor kidney."
Auxilio Mutuo moved to dismiss the complaint on the basis that the trial court lacked in personam jurisdiction over it. Auxilio Mutuo stated:
 "[The Holsombacks] attempt to invoke the jurisdiction of this Court by alleging that Auxilio Mutuo's testing of the subject donor kidney in the Commonwealth of Puerto Rico for Defendant LifeLink constitutes sufficient contact with the State of Alabama. While Auxilio Mutuo denies that it engaged in forum activities which would make it amenable to suit in this state, Auxilio Mutuo would further show unto this Court that [the Holsom-backs] cannot establish specific jurisdiction or general jurisdiction over [Auxilio Mutuo]. Specific jurisdiction over Auxilio Mutuo is unwarranted because this cause of action did not arise out of, nor is it related to, any contact of Auxilio Mutuo to the State of Alabama. General jurisdiction is also unwarranted, because there are no systematic and continuous contacts between Auxilio Mutuo and the State of Alabama. Courts can exercise general jurisdiction only when the [d]efendant is domiciled in the forum or its activities in the forum are `substantial, continuous and systematic' Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 415-416, 104 S.Ct. 1868, 1872-73, 80 L.Ed.2d 404 (1984)." *Page 439 
(Auxilio Mutuo's petition, Appendix 3.) In support of its motion, Auxilio Mutuo attached an affidavit from the hospital administrator at Auxilio Mutuo, stating:
 "1. My name is Jorge L. Matta and I am the Administrator of Hospital Espanol Auxilio Mutuo de Puerto Rico, Inc., which is also known as Auxilio Mutuo. I have personal knowledge of the facts stated in this Affidavit.
 "2. Auxilio Mutuo is a Puerto Rican corporation, with its principal place of business located in San Juan, Puerto Rico.
 "3. Auxilio Mutuo does not have, and never has had, any employees or officers permanently engaged in business in the State of Alabama.
 "4. Auxilio Mutuo does not engage in any persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in the State of Alabama.
 "5. Auxilio Mutuo does not own real property or personal property within the State of Alabama and has never done so.
 "6. Auxilio Mutuo is not authorized, licensed or registered to do business in the State of Alabama and has never been so authorized, licensed or registered.
 "7. Auxilio Mutuo pays no business taxes in the State of Alabama.
 "8. Auxilio Mutuo is not engaged in substantial, continuous or systematic activities in the State of Alabama.
 "9. Auxilio Mutuo does not engage in television or radio advertising in the State of Alabama.
 "10. Auxilio Mutuo has never voluntarily consented to jurisdiction of the State of Alabama in any lawsuit.
 "11. Auxilio Mutuo did not have knowledge on September 29, 2001, that the donor kidney which is the subject of this lawsuit was going to be transported to the State of Alabama for transplantation.
 "12. Auxilio Mutuo did not have a contract to perform testing of the donor kidney which is the subject of this law-suit with any patient, hospital or health care provider who resides or has its principal place of business in the State of Alabama."
(Auxilio Mutuo's petition, Appendix 4.)
The trial court conducted a hearing on Auxilio Mutuo's motion to dismiss. At the hearing, the Holsombacks opposed the dismissal of Auxilio Mutuo, arguing that the court had in personam jurisdiction over Auxilio Mutuo because, they said, "its contacts with Alabama, while few, gave rise to this lawsuit" and its "conduct and connection with Alabama are such that [Auxilio Mutuo] should reasonably anticipate being haled into court there." In support of their argument, the Holsombacks submitted an affidavit from Jean A. Davis, the executive vice president, OPO (organ procurement organization) services of LifeLink Foundation. She stated:
 "LifeLink Foundation, Inc., and its affiliate, LifeLink of Puerto Rico, are members of the United Network for Organ Sharing (UNOS), which segregates its member organizations into designated regions identified for organ recovery and distribution. UNOS Region 3 is one of the 11 UNOS Regions, and includes transplant centers located in Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, and Puerto Rico. Organs recovered for transplant are most frequently allocated/shared for transplant on a local, then a regional basis. LifeLink of Puerto Rico has been in operation since 1994. Significant increases in organ/tissue recovery have occurred in this time frame. *Page 440 
 "Auxilio Mutuo Hospital is a transplant center member of UNOS located within Region 3. The Auxilio Mutuo Hospital Clinical Laboratory is a CLIA [Clinical Laboratory Improvement Amendments, 42 U.S.C § 263a
et seq.] certified laboratory[1] owned and operated by Auxilio Mutuo Hospital. Auxilio Mutuo Hospital Clinical Laboratory routinely performs serological testing on organ/tissue donors recovered in Puerto Rico. These organs are shared throughout the United States, with the significant majority being placed in Region 3.
 "Any Region 3 UNOS member and participant in the organ sharing network is well aware that organs and tissue it procures or tests are routinely sent to and utilized by transplant centers throughout Region 3, including Alabama. In addition to this systematic sharing of organs and tissue procured from donors it has tested, Auxilio Mutuo Hospital routinely receives organs (kidneys) for transplant from outside Puerto Rico. UNOS data available to UNOS members such as LifeLink and Auxilio Mutuo shows that in calendar year 2004, thirteen (13) kidneys were imported to Auxilio Mutuo Hospital for transplant, and for calendar year 2005, through October 5, 2005, six (6) kidneys were imported for transplant at Auxilio Mutuo.
 "LifeLink Foundation, Inc., maintains computer-stored data concerning the organs and tissue recovered and transplanted through its affiliate organizations, including LifeLink' of Puerto Rico. . . .
 "Between January 1, 1994 and September 29, 2001 of the 342 kidneys recovered in Puerto Rico and transplanted, twenty-five (25), or 7%, were transplanted in Alabama. This is the highest number/percentage for any area outside of Puerto Rico. If a kidney was obtained from a donor and did not stay in Puerto Rico, Alabama was the most likely place it would be sent for transplant.
 "Between September 30, 2001, and September 12, 2005, forty-three (43) organ/bone donors were recovered through LifeLink of Puerto Rico. Auxilio Mutuo Hospital Clinical Laboratory provided serological testing in all such cases. The resulting organs/tissue recovered are often placed outside of Puerto Rico and many within UNOS Region 3. The donor whose kidney was transplanted to Lisa Holsomback at the Alabama Organ Center on September 30, 2001, whose serum was tested by Auxilio Mutuo Clinical Laboratory, was also an organ/bone donor.
 "Approximately 1720 bone grafts were produced from these forty-three (43) organ/tissue donors tested by Auxilio Mutuo Clinical Laboratory; 341 of which, or 19.8% were placed in Alabama. This means that approximately one fifth of all of the bone grafts produced from Auxilio Mutuo tested organ/bone donors were shipped to and utilized in Alabama. Of the forty-three (43) organ/bone donors tested by Auxilio Mutuo Hospital Clinical Laboratory twenty-five (25) donors generated at the least one bone graft placed in Alabama. That is, when Auxilio Mutuo Clinical Laboratory performs testing on an organ/bone donor like the donor in this case, there is a 58% (3 out of 5) likelihood that one or more grafts *Page 441 
from that donor will end up in Alabama."
(Auxilio Mutuo's petition, Appendix 7.) Auxilio Mutuo submitted another affidavit from its hospital administrator, Jorge L. Matta, in response to Davis's affidavit; that affidavit stated:
 "2. I have reviewed the affidavit of Jean Davis which is dated October 11, 2005 and which has been filed by [the Holsombacks'] counsel in this litigation.
 "3. The affidavit of Jean Davis is apparently being used by [the Holsom-backs] in an effort to show that Auxilio Mutuo has sufficient contacts with the State of Alabama so as to have Alabama courts subject this Puerto Rican Hospital to in personam jurisdiction.
 "4. The affidavit of Jean Davis referenced above presents allegations of fact which are not known by Auxilio Mutuo. More specifically, the affidavit of Jean Davis sets forth statements purporting to show the number and percentage of donated organs/bone grafts which has its serums tested in Puerto Rico and are eventually sent to Alabama.
 "5. However, Auxilio Mutuo does not determine where an organ/bone graft donated from Puerto Rico will be sent outside of the Commonwealth. Such determinations are strictly within the purview of LifeLink and not Auxilio Mutuo. Furthermore, Auxilio Mutuo does not deliver and is not involved in the delivery of any bone grafts or organs to any State in the United States for transplantation. This is done by LifeLink, not Auxilio Mutuo.
 "6. Auxilio Mutuo does not maintain records which reflect the ultimate destination of the organ or bone graft materials tested for LifeLink Foundation by Auxilio Mutuo's laboratory. It is aware through this claim that the organs (one of which is the subject of this lawsuit) were delivered to the State of Alabama. However, Auxilio Mutuo does not maintain records which show what other serological testing was done for organs/bone graft materials delivered to the State of Alabama by LifeLink."
(Auxilio Mutuo's petition, Appendix 8.)
Auxilio Mutuo also submitted its answer to certain interrogatories, in which Auxilio Mutuo stated that it did not deliver organs or bone grafts to any state in the United States for transplantation; that when conducting serological testing pursuant to an agreement between Auxilio Mutuo and LifeLink Foundation, it communicated directly with LifeLink by either lab reports or telephone or both; that it does not communicate with the recipient of the organ or bone-graft material; and that at the time it tested the blood serum from the kidney transplanted into Holsomback, Auxilio Mutuo did know that there was a possibility that the kidney might be sent to a state within the United States.
After considering the arguments and the evidence, the trial court denied Auxilio Mutuo's motion to dismiss, stating, in pertinent part, in its order:
 "[I]t appears that Auxilio Mutuo's contacts with Alabama are as follows: it tested organs to be sent to Alabama for transplant; it tested serum from the kidney in question and found it to be negative for infectious disease. The result was wrong in that the kidney was infected with the hepatitis virus. Based upon that test result, LifeLink brought the infected kidney to Birmingham where it caused [the Holsombacks'] damage. . . .
 ". . . .
 "The `product' placed in the stream of commerce is not an ordinary one. The defendants placed into the stream of commerce a human organ that was inherently *Page 442 
dangerous. Other courts have looked at such situations and found that where a non-resident defendant deals in such inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction. Poyner v. Erma Werke GmbH, 618 F.2d 1186, 1192 (6th Cir.1980); O'Neil v. Picillo, 682 F.Supp. 706
(D.C.R.I.1988).
 "The undisputed facts establish that organs and tissue that are tested by Auxilio Mutuo are shared throughout the United States with the significant majority being placed in UNOS [United Network for Organ Sharing] Region 3, which includes transplant centers located in Alabama. Between January 1, 1994 and September 29, 2001, 25 of the 342 kidneys recovered in Puerto Rico were transplanted in Alabama. This means that 7% were used in Alabama, the highest percentage for any area out-side Puerto Rico itself. If a kidney was obtained from a donor in Puerto Rico and did not stay in Puerto Rico, Alabama was the most likely place it would be sent for transplant. . . . The submitted statistics show that when Auxilio Mutuo performs testing on an organ/bone donor as in this case, there is a 58% likelihood that one or more grafts from that donor will end up in Alabama.
 "Due to the nature of this organ sharing network and the inherent necessity for regulated serological testing established by UNOS, the court finds that there are sufficient minimum contacts with the State of Alabama to support in personam jurisdiction over Auxilio Mutuo in this case. The State of Alabama has a deep and significant interest in adjudicating this matter. The UAB [University of Alabama at Birmingham] kidney transplant center is the second largest such center in the United States. The facts established regarding the UNOS network sharing guidelines and the statistical connection between Auxilio Mutuo and Alabama are significant. Auxilio Mutuo could reasonably anticipate that its tested organs would be transplanted in Alabama. The quality and nature of this activity is so important and so inherently dangerous that Auxilio Mutuo could reasonably anticipate being `haled into court' in Alabama if it erroneously tested an organ that was ultimately transplanted in this state.
 "It is of utmost importance that the Alabama medical institutions receiving organs for transplant and the patients who are the recipients of such organs have confidence that the organs they have acquired are safe. This court's notions of fair play and substantial justice are not offended by the exercise of in personam jurisdiction over Auxilio Mutuo under the undisputed facts of this case. On the contrary, it would violate such notions if an Alabama victim of such an error were denied access to the courts of this state.
 "It is, therefore, Ordered and Adjudged that the motion to quash service and to dismiss this defendant for lack of in personam jurisdiction filed by [Auxilio Mutuo] is hereby denied."
(Auxilio Mutuo's petition, Appendix 10.)
 Standard of Review "`"The writ of mandamus is a drastic and extraordinary writ, to be `issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.' Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503
(Ala. 1993); see also Ex parte Ziglar, 669 So.2d 133, 134 (Ala. 1995)." Ex parte *Page 443 Carter, [807 So.2d 534,] 536 [(Ala. 2001)].'
 "Ex parte McWilliams, 812 So.2d 318, 321
(Ala. 2001). `An appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction.' Elliott v. Van Kleef, 830 So.2d 726, 729 (Ala. 2002).
 "`"`In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiffs complaint not controverted by the defendant's affidavits, Robinson v. Giarmarco Bill, P.C., 74 F.3d 253 (11th Cir.1996), and Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829 (11th Cir.1990), and "where the plaintiffs complaint and the defendant's affidavits conflict, the . . . court must construe all reasonable inferences in favor of the plaintiff." Robinson, 74 F.3d at 255
(quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990)).'"
 "`Wenger Tree Serv. v. Royal Truck Equip., Inc., 853 So.2d 888, 894 (Ala. 2002) (quoting Ex parte Mclnnis. 820 So.2d 795, 798
(Ala. 2001)). However, if the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, "the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint." Mercantile Capital, LP v. Federal Transtel, Inc. 193 F.Supp.2d 1243, 1247
(N.D.Ala.2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir.2000)). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D.Del.1995)("When a defendant files a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.") (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir.1984)).'
 "Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 229-30 (Ala. 2004)."
Ex parte Bufkin, 936 So.2d 1042, 1044-45 (Ala. 2006).
 Legal Analysis
Auxilio Mutuo argues that the trial court erred in refusing to dismiss the Holsom-backs' claims against it because, it says, it does not have the minimum contacts with the State of Alabama necessary for the court to have personal jurisdiction over it.
The determination of a court's jurisdiction over a foreign entity falls within the purview of this State's "long-arm statute," which is actually Rule 4.2, Ala. R. Civ. P. Although Rule 4.2 was significantly revised effective August 1, 2004, because the underlying conduct occurred and this complaint was filed before that date, this Court applies Rule 4.2 as it existed before the amendment to the facts of this case.
In Leithead v. Banyan Corp., 926 So.2d 1025, 1029-30
(Ala. 2005), this Court addressed a similar situation and applied the law existing before the August 1, 2004, amendment to Rule 4.2, stating:
 "A state has jurisdiction over a person or corporation so long as its `long-arm statute' reaches the person or corporation and the state's jurisdiction comports with the requirements of due process. This Court has held that Alabama's long-arm `statute,' which is actually Rule 4.2, Ala. R. Civ. P., extends to the limits *Page 444 
of due process. Ex parte McInnis, 820 So.2d [795,] 802 [(Ala. 2001)]; Duke v. Young, 496 So.2d 37, 39 (Ala. 1986). At the time relevant to this action, Rule 4.2(a)(1)(B) provided that an `[a]ppropriate basis exists for service of process outside of this state upon a person in any action in this state when . . . the person has sufficient contacts with this state, as set forth in subdivision (a)(2) of this rule. . . .' Subdivision (a)(2), in turn, set forth eight categories of action that established the necessary `sufficient contacts' if a person engaged in any one of them. In the event that none of the specific actions listed brought the defendant within the State's jurisdiction, subdivision (a)(2)(I) provided that the State could assert jurisdiction over the person if he otherwise had `some minimum contacts with this state and, under the circumstances, it is reasonable to require the person to come to this state to defend an action.' This `catchall' provision authorized asserting jurisdiction to the extent permitted by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
 ". . . .
 "`"A physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident." Sieber v. Campbell, 810 So.2d 641, 644 (Ala. 2001). What is required, however, is that the defendant have such contacts with Alabama that it "`should reasonably anticipate being haled into court [here].'" Dillon Equities v. Palmer Cay, Inc., 501 So.2d 459, 462
(Ala. 1986) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).
 "`Depending on the quality and quantity of the contacts, jurisdiction may be either general or specific. Leventhal v. Harrelson, 723 So.2d 566, 569 (Ala. 1998). "General jurisdiction applies where a defendant's activities in the forum state are `substantial' or `continuous and systematic,' regardless of whether those activities gave rise to the lawsuit. . . . [A court has specific jurisdiction when a defendant has had few contacts with the forum state, but those contacts gave rise to the lawsuit." Id.]
 "`But regardless of whether jurisdiction is alleged to be general or specific, the nexus between the defendant and the forum state must arise out of "`an action of the defendant [that was] purposefully directed toward the forum State.'" Elliott [v. Van Kleef, 830 So.2d 726, 731 (Ala. 2002)] (quoting Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). "This purposeful-availment requirement assures that a defendant will not be haled into a jurisdiction as a result of `"the unilateral activity of another person or a third person."'" Elliott, 830 So.2d at 731 (quoting Burger King Corp. v. Rudzewicz, All U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).'
"Ex parte Dill, Dill, Carr, Stonbraker Hutchings,P.C., 866 So.2d [519] at 525-26 [(Ala. 2003)]. . . .
"As noted, for general jurisdiction to apply the out-of-state defendant's contacts with Alabama must be `substantial' or `continuous and systematic' Ex parte Dill, Dill, supra. Contacts may constitute general contacts `regardless of whether those activities gave rise to the lawsuit.' HelicopterosNacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414,104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)." *Page 445 926 So.2d at 1029-30 (footnotes omitted; some bracketed language added.)
Auxilio Mutuo contends that the Holsombacks cannot establish that the Jefferson Circuit Court has either general or specific personal jurisdiction over it. Specifically, Auxilio Mutuo argues that neither has it engaged in "continuous and systematic" contacts with Alabama, nor is there any nexus between its conduct and the Holsombacks' allegations. Auxilio Mutuo emphasizes that Alabama law requires that the "substantial connection" required to support a finding of minimum contacts must be by an action of the nonresident defendant "purposefully directed toward" Alabama and not the result of the "unilateral activity of another person or a third person." Auxilio Mutuo maintains that the evidence establishes that its contacts are solely with LifeLink and that it has no contact whatsoever with the donor of the organ or bone-graft materials or with the arrangements for the ultimate donation and transplant of the organ or bone graft. Therefore, it maintains that it does not have minimum contacts with Alabama sufficient to be haled into court here.
The Holsombacks argue that Auxilio Mutuo has minimum contacts with this State because, they say, Auxilio Mutuo is a member of the United Network of Organ Sharing ("UNOS") and the nature of the operations of UNOS in procuring, testing, and transplanting human organs is narrow and highly regulated, and, consequently, creates "reasonable anticipation" that its members will be subjected to the jurisdiction of Alabama.
In support of their argument, the Holsombacks urge that the trial court properly applied a lesser standard in determining that Auxilio Mutuo had minimum contacts with Alabama because they agree with the trial court that the human organ placed in Alabama's stream of commerce was "inherently dangerous." In its order, the trial court relied on the holdings in Poyner v.Erma Werke GmbH, 618 F.2d 1186, 1192 (6th Cir.1980), andO'Neil v. Picillo, 682 F.Supp. 706 (D.R.I.1988), which involved the placement of a handgun and hazardous waste, respectively, into the stream of commerce. In Poyner
and O'Neil, the courts required a lesser showing of minimum contacts to establish personal jurisdiction because of the nature of the product the defendants had placed in the respective state's stream of commerce.
Auxilio Mutuo and LifeLink[2] argue, and we agree, that a human organ is not an "inherently dangerous product" and, therefore, that the lesser standard applied in the trial court's analysis was improper.[3]
In Defore v. Bourjois, Inc., 268 Ala. 228,105 So.2d 846 (1958), this Court, in determining whether a perfume bottle was inherently dangerous, quoted the following definition of a product that is inherently dangerous to human life or health from 42 A.L.R. 1243 at 1244: *Page 446 
 "`An article may be said to be inherently dangerous where the danger lies in the nature or character of the article. Gas, gasoline, poison, gunpowder, dynamite, etc., are illustrations of articles which are inherently dangerous. The manufacturer's sale of any of these articles as and for some other article not inherently dangerous will render him liable to anyone injured thereby. . . .'
 "Articles or substances held not to be inherently dangerous within the meaning of the rule include a chain, Employers' Liability Assur. Corp. v. Columbus McKinnon Chain Co., D.C.N.Y., 13 F.2d 128 [(1926)]; a bar of soap, Barrango v. Hinckley Rendering Co., 230 Mass. 93, 119 N.E. 746
[(1918)]; a cast-iron pipe elbow, Lee v. Walworth Co., D.C.N.Y., 1 F.R.D. 569 [(1940)]; cattle manure, McMurray v. Vaughn's Seed Store, 117 Ohio St. 236, 157 N.E. 567 [(1927)]; carbonic acid in bottled drinks, Graham v. Cloar, 30 Tenn.App. 306, 205 S.W.2d 764 [(1947)]; a cosmetic box decorated with a metal star, Poplar v. Bourjois, Inc., 298 N.Y. 62, 80 N.E.2d 334 [(1948)]; a crate in which an appliance was packed, O'Neil v. American Radiator Co., D.C.N.Y., 43 F.Supp. 543
[(1942)]; an electric body-vibrating machine, Robbins v. Georgia Power Co., 47 Ga.App. 517, 171 S.E. 218 [(1933)]; an electric stove, Roettig v. Westinghouse Electric Manufacturing Co., D.C.Mo., 53 F.Supp. 588 [(1944)]; an elevator, McDonald v. Haughton Elevator Machine Co., 60 Ohio App. 185, 20 N.E.2d 253 [(1938)]; Zieman v. Kieckhefer Elevator Mfg. Co., 90 Wis. 497, 63 N.W. 1021 [(1895)]; an exercising device, Heggblom v. John Wanamaker New York, 178 Misc. 792, 36 N.Y.S.2d 777 [(1942)]; a flatiron, Pitman v. Lynn Gas Electric Co., 241 Mass. 322, 135 N.E. 223 L (1922)]; a gas stove, McCabe v. Boston Consol. Gas Co., 314 Mass. 493, 50 N.E.2d 640 [(1943)]; a gate stop, Schindley v. Allen-Sherman-Hoff Co., 6 Cir., 157 F.2d 102 [(1946)]; hair dye, Karr v. Inecto, Inc., 247 N.Y. 360, 160 N.E. 398 [(1928)]; a hay baler, Yawn v. Allis-Chalmers Mfg. Co., 253 Wis. 558, 34 N.W.2d 853 [(1948)]; a hot water tank, Giberti v. James Barrett Mfg. Co., 266 Mass. 70, 165 N.E. 19 [(1929)]; lubricating oil, Berger v. Standard Oil Co., 126 Ky. 155, 103 S.W. 245, 11 L.R.A., N.S., 238 [(1907)]; mincemeat, Salmon v. Libby, McNeil Libby, 114 Ill.App. 258
[(1904)]; a nailed shoe sole, Kerwin v. Chippewa Shoe Mfg. Co., 163 Wis. 428, 157 N.W. 1101, L.R.A. 1916E, 1188 [(1916)]; a `pear-burner,' Talley v. Beever Hindes, 33 Tex.Civ. App. 675, 78 S.W. 23 [(1903)]; a porch swing, Osheroff v. Rhodes-Burford Co., 203 Ky. 408, 262 S.W. 583 [(1924)]; a refrigerator, Borg-Warner Corporation (Norge Division) v. Heine, 6 Cir., 128 F.2d 657 [(1942)]; a sidesaddle, Bragdon v. Perkins-Campbell Co., 3 Cir., 87 F. 109, 30 CCA. 567, 66 L.R.A. 924 [(1898)]; a sofa, Simmons Co. v. Hardin, 75 Ga.App. 420, 43 S.E.2d 553
[(1947)]; a steel oil drum, Moore v. Jefferson Distilling Denaturing Co., 169 La. 1156, 126 So. 691 [(1930)]; a spring clamp with lugs to keep lid on glass jar, Crandall v. Stop Shop, Inc., 288 Ill.App. 543, 6 N.E.2d 685 [(1937)]; a voting machine, Creedon v. Automatic Voting Mack Corporation, 243 App. Div. 399, 276 N.Y.S. 609
[(1935)], affirmed 268 N.Y. 583, 198 N.E. 415; and an ordinary wooden bed, Field v. Empire Case Goods Co., 179 App. Div. 253, 166 N.Y.S. 509 [(1917)]; Isbell v. Biederman Furniture Co., Mo.App., 115 S.W.2d 46 [(1941)]."
268 Ala. at 231-32, 105 So.2d at 848-49.
Applying the above definition, we hold that a human organ is not an inherently *Page 447 
dangerous product. While the human kidney involved in is this particular case was defective, human kidneys in general are not inherently dangerous. Therefore, we need not address the argument of Auxilio Mutuo and LifeLink regarding the propriety of the trial court's use of a lower standard for finding the existence of minimum contacts for defendants placing inherently dangerous products into the stream of commerce.
We also agree with Auxilio Mutuo that the Holsombacks' evidence does not establish that Auxilio Mutuo has minimum contacts with this State so as to establish personal jurisdiction. In particular, the evidence does not establish a nexus between Auxilio Mutuo and Alabama arising out of "`an action of [Auxilio Mutuo that was] purposefully directed toward [Alabama].'"Elliott v. Van Kleef 830 So.2d 726, 731
(Ala. 2002) (quoting Asahi Metal Indus. Co. v. Superior Courtof California, 480 U.S. 102, 112, 107 S.Ct. 1026,94 L.Ed.2d 92 (1987)). While we agree with the Holsombacks and respondent LifeLink that Auxilio Mutuo provided an important link in the organ-transplant process, the evidence does not establish that Auxilio Mutuo had a substantial connection with Alabama. Although Auxilio Mutuo does test organs and bone grafts that appear to have been distributed in Alabama, it does not determine where the organs and bone grafts it tests are delivered; it does not engage in any aspect of the delivery of the organs and bone grafts to this State; and it does not solicit directly or indirectly business in this State. Cf.Slaughter v. Life Connection of Ohio, 907 F.Supp. 929
(M.D.N.C.1995) (holding that Life Connection of Ohio had sufficient contacts with North Carolina to establish specific jurisdiction because, among other factors, Life Connection of Ohio sent organs to North Carolina), and Bergherr v.Sommer, 523 N.W.2d 17 (Minn.Ct.App. l994) (holding that a Minnesota court had personal jurisdiction over a Texas laboratory that tested a Minnesota plaintiffs pap smear because, among other reasons, the Texas laboratory solicited business from Minnesota through its agreement with an intermediary laboratory). Nothing before us establishes that Auxilio Mutuo purposefully directed any action toward Alabama.
Because the Holsombacks have failed to present evidence indicating that Auxilio Mutuo had contacts with Alabama sufficient to confer personal jurisdiction over Auxilio Mutuo, the trial court erred in denying the motion to dismiss filed by Auxilio Mutuo.
 Conclusion
Auxilio Mutuo has established a clear legal right to a dismissal of the Holsom-backs' claims against it. Therefore, we grant the petition and issue the writ of mandamus. We direct the trial court to vacate the order denying the motion to dismiss and to enter an order dismissing the Holsombacks' complaint insofar as it asserts claims against Auxilio Mutuo.
PETITION GRANTED; WRIT ISSUED.
NABERS, C.J., and SEE, LYONS, HARWOOD, SMITH, BOLIN, and PARKER, JJ., concur.
WOODALL, J., dissents.
[1] A CLIA certified laboratory is a laboratory that has been certified as compliant with the quality standards required to perform laboratory testing of materials derived from the human body, as established by the federal regulations promulgated for Medicare and Medicaid services.
[2] LifeLink, although a defendant below, is a respondent to this petition for the writ of mandamus. It is in agreement with Auxilio Mutuo, however, on the issue whether a human organ is an inherently dangerous product.
[3] The trial court cited in its order Poyner v. ErmaWerke GmbH, supra, and O'Neil v. Picillo, supra, for the proposition that the standard to be met before a court can exercise personal jurisdiction over a nonresident defendant is lowered when the product the defendant has placed in the stream of commerce is inherently dangerous. Neither of the cases cited in the trial court's order is binding on this Court, and we find no Alabama caselaw that allows for such a lowered standard when an inherently dangerous product is involved; however, it is not necessary for us to address that question. *Page 448